801 So.2d 877 (2001)
Thomas OVERTON, Appellant,
v.
STATE of Florida, Appellee.
No. SC95404.
Supreme Court of Florida.
September 13, 2001.
Rehearing Denied December 3, 2001.
*881 Bennett H. Brummer, Public Defender, and Maria E. Lauredo, Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Thomas Overton. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons detailed below, we affirm Overton's convictions and death sentences.

I. FACTS
On August 22, 1991, Susan Michelle MacIvor, age 29, and her husband, Michael Maclvor, age 30, were found murdered in their home in Tavernier Key. Susan was eight months pregnant at the time with the couple's first child.
Susan and Michael were last seen alive at their childbirth class, which ended at approximately 9 p.m. on August 21, 1991. Concerned co-workers and a neighbor found their bodies the next morning inside the victims' two-story stilt-house located in a gated community adjacent to a private airstrip.
Once law enforcement officers arrived, a thorough examination of the house was undertaken. In the living room, where Michael's body was found, investigators noted that his entire head had been taped with masking tape, with the exception of his nose which was partially exposed. He was found wearing only a T-shirt and underwear. There was a blood spot on the shoulder area of the tee-shirt. When police removed the masking tape, they discovered that a sock had been placed over his eyes, and that there was slight bleeding from the nostril area. Bruising on the neck area was also visible. The investigators surmised that a struggle had taken place because personal papers were scattered on the floor near a desk, and the couch and coffee table had been moved. A small plastic drinking cup was also found beside Michael's body.
*882 Continuing the search toward the master bedroom, a piece of clothesline rope was found just outside the bedroom doorway. Susan's completely naked body was found on top of a white comforter. Her ankles were tied together with a belt, several layers of masking tape and clothesline rope. Her wrists were also bound together with a belt. Two belts secured her bound wrists to her ankles. Around her neck was a garrote formed by using a necktie and a black sash, which was wrapped around her neck several times. Her hair was tangled in the knot. Noticing that a dresser drawer containing belts and neckties had been pulled open, officers believed that the items used to bind and strangle Susan came from inside the home. Her eyes were covered with masking tape that appeared to have been placed over her eyes in a frantic hurry. Under the comforter upon which the body rested were several items which appeared to have been emptied from her purse. Also under the comforter was her night shirt; the buttons had been torn off with such force that the button shanks had been separated from the buttons themselves. Near the night shirt were her panties which had been cut along each side in the hip area with a sharp instrument.
Within the master bedroom, the investigators also found a .22 caliber shell casing, and somewhat later a hole in a bedroom curtain was noticed. Also in that bedroom, the officers found an address book with some pages partially torn out.
The sliding glass door in the bedroom was open and a box fan was operating. There had been a heavy rain storm the night before and the heat and humidity were quickly rising. As a result of these conditions, Susan's body was covered with moisture. The investigators used a luma light to uncover what presumptively appeared to be seminal stains on Susan's pubic area, her buttocks, and the inside of her thighs. The serologist later testified that he collected what appeared to be semen from Susan's body with swab applicators. Three presumptive seminal stains also appeared on the fitted sheet. Within close proximity to one of the seminal stains on the fitted sheet, a stain which appeared to be dried feces was located. It was also noticed that Susan had fecal matter in her buttocks area. Ultimately, the officers took the comforter, fitted sheet, and mattress pad into evidence.
The investigation next proceeded to a spare bedroom, which was then being renovated for use as a nursery for the baby. The sliding glass door in that room was also open. A ladder was found propped up against the balcony outside the nursery. Cut clothesline rope was hanging from the balcony ceiling, and outside the home, the phone wires had been recently cut with a sharp instrument.
The medical examiner's testimony at trial established multiple factors. As to Michael, the autopsy revealed that he suffered a severe blow to the back of the head. The external examination of Michael's neck revealed several bruises particularly around the larynx, along with ligature marks which indicated that the device used to strangle Michael had been wrapped around his neck several times,[1] and that pressure was applied from behind. The internal examination of Michael's neck confirmed that his larynx, as well as the hyoid bone and epiglottis, had been fractured. There was also bruising and an internal contusion indicative of a *883 heavy blow to the back of the neck. The internal examination of the neck area revealed that the neck was unstable and dislocated at the fifth cervical vertebrae. There was also internal bleeding in the left shoulder, indicative of a severe blow to the area. Additionally, Michael had significant bruising in his abdominal area causing a contusion fairly deep within the abdomen. The doctor testified that the injury could have been inflicted by a strong kick to the area. Based on his observations, the doctor opined that the cause of death was asphyxiation by ligature strangulation (rope). He added that Michael could have been rendered unconscious ten to fifteen seconds after the ligature was applied, or that it could have taken longer depending on the pressure applied.
With respect to Susan, the external examination of her face revealed that she had received several slight abrasions. The ligature marks around her neck indicated that she was moving against the ligature, thereby causing friction. Also, the discoloration in her face indicated that blood was not exiting the head area as fast as it was entering. According to the medical examiner, this is indicative of an incomplete application of the ligature, which demonstrated that, more likely than not, a longer period of time passed before Susan lost consciousness once the ligature was applied. Her wrists also exhibited ligature marks and her hands were clenched. Moving down to her lower body, an abrasion to her vulva and several abrasions to her legs indicative of a struggle were found. The medical examiner concluded, based on the totality of the circumstances, that she had been sexually battered. When interrogated for an explanation of the presence of feces in the rectal area, the doctor determined that it could have happened either at the time of death or it could have been caused by her fear.
The medical examiner determined that Susan was approximately eight months pregnant at the time and proceeded to examine the fetus. The doctor determined that the baby would have been viable had he been born, and that he lived approximately thirty minutes after his mother died. The doctor testified that there was evidence that he tried to breath on his own.
Dr. Pope, the serologist, examined the bedding and made cuttings in accordance with the markings he had made at the scene. One of the stains from the fitted sheet and another stain from the mattress pad tested positive for sperm. The cuttings were later sent to FDLE for DNA testing.[2] Examination of the swabs from Susan's body failed to reveal the presence of sperm cells.[3]
The discovery of this death scene produced a large-scale investigation, and comparable *884 media coverage focused on the murders. Over the years following the murders, law enforcement agencies investigated several potential suspects. Through this investigatory process, Thomas Overton's name was brought up during a brain-storming session in May 1992. The reason he was considered a suspect was because he was a known "cat burglar," whom police suspected in the murder of 20 year old Rachelle Surrett.[4] At the time of the MacIvor murders, Overton worked at the Amoco gas station which was only a couple of minutes away from the MacIvor home. Janet Kerns, Susan's friend and fellow teacher, had been with Susan on several occasions when Susan pumped gas at that Amoco station. No further investigation was undertaken with respect to Overton at that time.
In June of 1993, the cuttings from the bedding were sent to the FDLE lab in Jacksonville where James Pollock, an expert in forensic serology and DNA identification, proceeded to examine the cuttings. Through a process known as restriction fragment length polymorphism ("RFLP"), Dr. Pollock was able to develop a DNA profile from two of the cuttings (i.e., one cutting from the fitted sheet and another from the mattress pad). Specifically, the profile was developed by examining the DNA at five different locations, known as loci, within the chromosomes. Dr. Pollock compared the profile to samples from several potential suspects. No match was made at that time.
In late 1996, Overton, then under surveillance, was arrested during a burglary in progress. Once in custody, officers asked him to provide a blood sample, which Overton refused. Days later, Overton asked correction officers for a razor, and one was provided. Overton removed the blade from the plastic razor using a wire from a ceiling vent, and made two cuts into his throat.[5] The towel that was pressed against his throat to stop the bleeding was turned over to investigators by corrections officers. Based on preliminary testing conducted on the blood from the towels, police obtained a court order to withdraw the defendant's blood for testing.
In November of 1996, over five years after the murders, Dr. Pollock was able to compare the profile extracted from the stains in the bedding to a profile developed after extracting DNA from Overton's blood. After comparing both profiles at six different loci,[6] there was an exact match at each locus. Dr. Pollock testified that the probability of finding an unrelated individual having the same profile was, conservatively, in excess of one in six billion Caucasians, African Americans and Hispanics.
In 1998, the cuttings from the bedding were submitted to yet another lab, the Bode Technology Group ("Bode"). Dr. Robert Bever, the director at the Bode lab, testified as to the tests which were conducted on the bedding and the resulting conclusions. The Bode lab conducted a different DNA test, known as short tandem repeat testing ("STR"), from that performed by the FDLE. Overton's DNA and that extracted from a stain at the scene matched at all twelve loci. These results *885 were confirmed by a second analyst and a computer comparison analysis. Asked to describe the significance of the Bode lab findings, Dr. Bever testified that the likelihood of finding another individual whose DNA profile would match at twelve loci was 1 in 4 trillion Caucasians, 1 in 26 quadrillion African Americans and 1 in 15 trillion Hispanics.
In addition to the presentation of the DNA evidence, the State presented the testimony of two witnesses formerly incarcerated in the same facility with Overton. The first was William Guy Green, who testified that Overton had admitted to him that Overton had "done a burglary at a real exclusive, wealthy, wealthy area down in the Keys. The guy had his own airplane and a private airway and he could land his plane in his front yard." Overton further told Green that when he went into the house, he "started fighting with the lady," whom he later described as a "fat bitch," and that "she jumped on his back and he had to wastewaste somebody in the Keys." Green also testified that Overton stated that he had struggled with another person inside the house. Green further testified that Overton spoke to him about specific action he would take when he committed burglaries. Among these precautions were the cutting of phone lines before going into the house to stop victims from calling out or to stop automatic alarm systems; he would always wear gloves, and he would bring with him a "kit," consisting in part of a gun, knife, gloves and disguises. Green also testified that Overton told him that the "best time" to commit a burglary would be during a power outage or severe storm.
The second informant to testify was James Zientek, who met Overton at the Monroe County Jail in May 1997. Overton, who believed that Zientek was a hardened criminal from New York, sought Zientek's assistance to carry out a plan that would relieve Overton from the pending charges. Specifically, Overton planned to give Zientek significant details of the Maclvor murders, and then have Zientek contact authorities and inform them that another inmate by the name of Ace had provided such details. Using Overton's logic, this would create reasonable doubt and he would be found not guilty. Therefore, during the course of several months, according to Zientek, Overton gave Zientek precise details of what occurred in the MacIvor home on the night the couple was murdered. Overton also showed Zientek pictures related to the crimes, which Overton had obtained to assist his attorneys in preparing his defense. Specifically, Overton told Zientek that he had met Susan at the Amoco gas station where he worked. Overton believed that he had a "hot and cold type relationship" with Susan; some days she was polite to him and others she was "cold and bitchy." There came a point when Susan stopped coming to the gas station. However, according to Zientek, Overton retrieved Susan's address from either a check or a credit card receipt. Zientek testified that Overton informed him that he had surveilled the house on several occasions. On one occasion, Overton had observed Michael doing construction work at the lower level of the house. Another time, he said he had intended to enter the home, but did not because he realized that the MacIvors had company.
Turning to the events on the night of August 21, 1991, Overton told Zientek that he went to the home carrying a bag, which contained, among other things, a police scanner. He described his attire as being a Ninja-type suit, consisting of a mask, black military-style fatigues and gloves. One of the first things Overton completed when he arrived was the cutting of phone wires. He then positioned a ladder *886 against the balcony that surrounded the house, but in the process of moving the ladder, he made a noise. A light in the house came on which caused him to wait outside for approximately twenty minutes before ascending the ladder. Once he reached the balcony, Overton cut some clothesline, "popped" the sliding glass door to the spare bedroom and gained entry into the home. He walked around the house and saw the MacIvors sleeping in their bedroom. He proceeded to walk throughout the house, but suddenly he heard a noise and observed Michael walking over to the kitchen and opening the refrigerator. Overton said he panicked and that his adrenaline started rushing. Michael started looking around as if he sensed that something was wrong. Michael walked out of the kitchen and through the area where Overton was then standing. Overton then approached Michael from behind and "slammed him in the back of the head" with a pipe he had found at the house. Zientek testified that "the blow to the head with the pipe didn't immediately knock him out. There was a struggle and Mr. Overton knocked him out with his fist." While Overton was attempting to restrain Michael, Susan ran out of the bedroom screaming. He chased her back into the bedroom and temporarily restrained her, using articles he found inside the bedroom to bind her. Overton tried to calm Susan by stating that as long as everyone cooperated no one would get hurt. However, Susan began to plead with him, inquiring "Why are you doing this to me?" She told him that she was married, and began to plead with Overton for her husband's and baby's life. Overton also admitted to Zientek that Susan had stated: "I know who you are."
At that point, Overton became "concerned about the male just being temporarily knocked out. He knew that he wasn't dead." He then proceeded to place a sock over Michael's eyes and covered his face with masking tape. According to Zientek's testimony, Overton did not strangle Michael at that point. Instead, he went back into the master bedroom and raped Susan. When he had completed his attack, Overton said he strangled her because he "doesn't leave any witnesses." He also stated that either in the process, or after completing the strangulation, Overton noticed motion in her stomach, placed his hand over it, and felt the fetus move.
Overton then returned to the living room area "where the male was apparently just becoming conscious." Overton then kicked Michael in the abdominal area and proceeded to strangle him with "some kind of cord." Overton "made it very clear that he doesn't leave witnesses." Overton also explained to Zientek that the reason why he placed a sock over Michael's eyes and tape around his head was because he thought that as he strangled Michael, his eyes would bulge out and he would bleed through his nose.
Appellant continued to show Zientek photographs from the scene. When Zientek saw a picture of a shell casing and a bullet hole in the curtain, he asked Overton, "Why would they take a picture of that?" Overton replied that the casing and the bullet hole had nothing to do with the crime. Overton further stated that he "confuse[d] the crime scene" and ripped pages from the address book in the bedroom because he believed it would lead the police to think that the attacker wanted to remove the assailant's name from the phone book. Overton also told Zientek that he took things "nobody would realize were gone." The only item which neither law enforcement officers nor the families were able to account for were several pictures that Susan had taken that weekend of her pregnant stomach. Overton essentially *887 concluded by informing Zientek that he entered the house with the intent to rape Susan.
Zientek also testified that while looking at autopsy photos of one of the victims, he began to vomit. Overton started to laugh and cautioned Zientek to not get the pictures wet. Overton also showed Zientek a picture of a small chalkboard in the kitchen where one of the victims had written "renew life insurance." Overton laughed and said something to the effect that, "You don't think they knew what time it was?"
The primary thrust of the defense in the case was centered upon a theme that law enforcement officers, Detective Visco in particular, had planted Overton's semen in the bedding, which was essential to the prosecution.[7] The defense theorized that Detective Visco obtained the defendant's sperm from Overton's one-time girlfriend, Lorna Swaybe, transported the sample in a condom, and placed it on the bedding.[8]
In an attempt to substantiate this fabrication of evidence theory, the defense consulted Dr. Donald Wright, a forensic pathologist. The doctor suggested that the defense examine the samples from the bedding for Nonoxynol 9, a compound contained in spermicidal condoms. Relying on this advice, the defense caused the samples to be sent to the lab at the Consumer Products Testing Company in New Jersey.
In the sample labeled as originating from the bottom sheet, the lab director, Mr. Trager, found 53 micrograms of Nonoxynol 9. The state attorney's office requested a confirmatory test and submitted two new cuttings from the bedding sheet.[9] In the first sample, Trager found 50 micrograms of Nonoxynol 9. In the second sample, Trager also found an undetermined amount of Nonoxynol 9.[10] Also, 11 micrograms of Nonoxynol 9 were found in a sample from the comforter.[11] On cross-examination by the State, Trager testified that there are various forms of Nonoxynol and that the tests he performed did not provide a basis to distinguish whether the Nonoxynol 9 found on the bed sheet was of a spermicidal nature, or whether it was a commercial grade of Nonoxynol 9 commonly used in household detergents. Although he acknowledged that the perpetrator could have been wearing a condom which might have torn during the course of the struggle with Susan, Dr. Wright continued to opine that the seminal fluid forming the stain on the fitted sheet had been planted through the use of a condom.[12]
*888 Several factors were elicited during cross-examination. A spermicidal condom contains 25 to 35 milligrams of Nonoxynol 9. It may be concluded that there are usually 25,000 to 35,000 micrograms of Nonoxynol 9 in one spermicidal condom. In this case, 53 micrograms were found from the first test sample and 50 micrograms from the second test sample. Dr. Wright further noted that the initial report he received from Mr. Trager (i.e., the report that led Wright to believe that the seminal fluid had been planted) indicated that the amount found was 53 milligrams (there are 1000 micrograms in 1 milligram), but that a revised report indicated that there had been a typographical mistake and that the actual amount of Nonoxynol 9 present was only 53 micrograms. Dr. Wright candidly admitted that he did not know the amount of Nonoxynol 9 normally contained in a condom when he initially suggested that the seminal fluid had been planted; nor did he know that not all condoms contain Nonoxynol 9 or that Nonoxynol 9 was used in detergents.
In response to this defense expert's testimony presented to support the fabrication theory, the State presented one rebuttal witness, Mr. Richard Oliver, a chemist from the Home Personal Care Industrial Ingredients Division of a national laboratory, the company which is the sole manufacturer in the United States of Nonoxynol 9 as a spermicide. Oliver testified that Nonoxynol 9 is not only used as a spermicide (i.e., spermicidal Nonoxynol 9), but it is also commonly incorporated as an ingredient in household detergents (i.e., commercial grade Nonoxynol 9). Mr Oliver testified that as a manufacturer, his company could possibly tell the difference between the two types, given a "significantly large sample." He added, however, that after either type of the chemical has been "put out into the environment and say, placed on other objects," there is no test to distinguish between the two types of Nonoxynol 9. After reviewing the results of the tests performed by Mr. Trager, Oliver concluded that the correct methodology had been used, but based upon sample quantities extracted from the fitted sheet, there was absolutely no way to determine whether the Nonoxynol 9 found was spermicidal (from a condom) or commercial grade (from detergent). Oliver further opined that it is "most likely" that residue amounts of the commercial grade Nonoxynol 9 remain after the rinse cycle in a standard washing machine. Ultimately, during closing arguments, the State argued both that the perpetrator might have been wearing a spermicidal condom, or that any amount of Nonoxynol 9 found in the fitted sheet was residue which remained after the sheet had been washed.
At the conclusion of the guilt phase proceedings, the jury found Overton guilty of the first-degree murders of Susan and Michael MacIvor. The jury also returned guilty verdicts as to the charges of killing an unborn child, burglary, and sexual battery.
At the penalty phase, the State presented only victim-impact evidence, and relied on the testimony from the guilt phase proceedings in support of the aggravating factors it sought to establish. The defendant declined to present any evidence in mitigation of the death penalty and unequivocally stated on several occasions that he did not want his attorneys to present any mitigating evidence, nor would he permit them to make any arguments on his behalf. After concluding the penalty phase deliberations, the jury recommended imposition of the death penalty by a vote of nine to three as related to the death of Susan, and as to *889 Michael MacIvor, the jury recommendation favored the death penalty by a vote of eight to four.
The trial court found the following aggravators as to both victims: (1) the crimes were heinous, atrocious and cruel ("HAC"); (2) the murders were committed in a cold, calculated and premeditated manner ("CCP"); (3) the defendant has been previously convicted of another offense involving the use of violence (contemporaneous murder); (4) the murders occurred during the commission of a sexual battery and burglary; and (5) the murders were committed in an attempt to avoid arrest.
With regard to mitigation, the court considered, pursuant to section 921.141(6)(h), Florida Statutes (1999), the defendant's family background, military record, employment record, possible history of substance abuse and possible mental health problems. The judge concluded that nothing in the defendant's background could be classified as a statutory mitigating circumstance. As to nonstatutory mitigators, the court found that the defendant would be incarcerated for the rest of his life with no danger of committing any other violent acts, but gave this factor little weight. The court also recognized the defendant's courtroom demeanor and behavior as a nonstatutory mitigating factor, and accorded it some weight.
The trial court ultimately determined that "in weighing the aggravating circumstances against the mitigating circumstances, the scales of life and death tilt unquestionably to the side of death." Accordingly, the judge imposed the death penalty upon Overton for the murders of Susan and Michael MacIvor. As to the other offenses, Overton was sentenced to 15 years for the killing of an unborn child and to two terms of life imprisonment for the burglary and sexual battery. This direct appeal followed.

II. Analysis

A. Cause Challenges
As his first issue on appeal, Overton asserts that the trial court erred in denying defense challenges for cause as to prospective jurors Russell and Heuslein. Overton claims that Mr. Russell should have been excused for cause based on his stated views regarding the defendant's right to remain silent, the prospective juror's awareness of security measures, and his prior knowledge of facts concerning events which were not the subject of the trial. Overton further maintains that Mr. Heuslein should have been dismissed for cause because he also was aware of the security measures being employed, and because of his views on the death penalty.
First, we agree with the appellant that this issue was properly preserved by trial counsel. See Trotter v. State, 576 So.2d 691, 693 (Fla.1990). Second, we note that to prevail with this argument, Overton must establish that the trial court erred in denying the challenges for cause as to both Russell and Heuslein because the trial court did award the defense one additional peremptory challenge, thereby replacing one of the peremptory challenges expended on either Russell or Heuslein. This issue could only constitute reversible error if we conclude that the trial court erred in denying the challenges as to both of these potential jurors. See, e.g., Watson v. State, 651 So.2d 1159, 1162 (Fla.1994) ("Since the trial judge gave Watson one additional peremptory challenge, he is not entitled to reversal unless both jurors were improperly excused."); Cook v. State, 542 So.2d 964, 969 (Fla.1989) ("Because the trial judge granted the appellant's motion for one additional challenge, appellant is entitled to *890 have his conviction reversed only if he can show that the judge abused his discretion in refusing to excuse both jurors Sergio and Boan for cause.").
Turning to the question of whether it was error to deny the cause challenges as to Russell and Heuslein, recently, in Kearse v. State, 770 So.2d 1119, 1128 (Fla.2000), we detailed the law with respect to this issue. Initially, it is clear that the test to determine a juror's competency is whether that juror can set aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court. See also Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). We added that "[a] juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind." Kearse, 770 So.2d at 1128 (citing Bryant v. State, 656 So.2d 426, 428 (Fla.1995)). It is also well settled that the trial court has broad discretion in determining whether to grant or deny a challenge for cause based on juror incompetency, and the decision will not be overturned on appeal absent manifest error. See Van Poyck v. Singletary, 715 So.2d 930, 931 (Fla.1998); Mendoza v. State, 700 So.2d 670, 674 (Fla. 1997).

1. Prospective Juror Russell
With these standards in mind, we must determine whether the trial court erred in denying the challenge for cause as to prospective juror Russell. When questioned as to his thoughts on the presumption of innocence and a defendant's right to remain silent during the trial, Russell responded: "I understand what Judge Jones said, but I kind of believe like, I'd want to get up there if I was innocent, you know, and say what I had to say to explain myself." Shortly thereafter, he added:
MR. RUSSELL: I always think if a person's innocent they should get up on that stand and speak for themselves. That's the way I believe. But also, I understand what the Judge said, too. It's like confusing to me.... But in all honesty, that's what I really believe. I believe a person should get up there and say, I didn't do this.

MR. SMITH [Defense Counsel]: That's what you want someone to do?
MR. RUSSELL: Yes.

(Emphasis supplied.) Immediately thereafter, the judge explained that the defendant did not have to testify and that a failure to testify could not be held against him. Russell responded:
MR. RUSSELL: I could follow the law, what you're telling me.

THE COURT: Uh-huh.
MR. RUSSELL: But I'm giving you my honest opinion.

THE COURT: That's all we want.
MR. SMITH: Was there anything that you would have to overcome then in your mind for whatever reason, whether it's my advice or
MR. RUSSELL: If it's your advice to him not to
MR. SMITH: Or for whatever reason, you think that you would tend to kind of hold that against him or want to hear from him?
MR. RUSSELL: It's like I said, I could follow the Judge's rules, but I still feel the person should get up there if they're innocent.

MR. SMITH: Okay.
MR. RUSSELL: I can'tI can't see myself sitting there and being accused of a crime and not getting up there and trying to clear myself, you know.

*891 MR. SMITH: Uh-huh.
(Emphasis supplied.)
Each juror was then individually questioned with respect to the responses they had given during generalized voir dire. The following colloquy ensued:
THE COURT: When we were out there in the open group there, you had some reservations about the Defendant's right to remain silent.
MR. RUSSELL: Yeah.
THE COURT: What if, as part of the evidence, you were not presented with testimony from the Defendant?
MR. RUSSELL: Well, I willI will be able to follow your instruction without 
THE COURT: meaning if I sit here and say he doesn't, the Defendant
MR. RUSSELL: If he doesn't testify and you say that he doesn't have to, then I respect that.

THE COURT: Not only doesn't he have to, but it can't be considered as evidence of guilt.
MR. RUSSELL: Right, I wouldright.

THE COURT: It cannot be used in any adverse way against him.
MR. RUSSELL: Right.

THE COURT: It cannot come into your deliberations whatsoever.
MR. RUSSELL: Right.

THE COURT: Yesterday you had reservations about that.
MR. RUSSELL: Well, that'sright, that's the way I always feel about it when someone doesn't take the stand, I figure they've got something to hide. That's the way I've always believed.

THE COURT: Right.
MR. RUSSELL: But I can shut that out. If you tell me to shut it out, I still shut it out. ...
SMITH: You said that you would expect and you've always believed that someone should testify, isn't that what you just stated?
MR. RUSSELL: You mean the
MR. SMITH: The person charged should always testify.
MR. RUSSELL: Yeah. I don't know, I just, to me I feel like if I was charged with a crime that I'd want to get up there knowing that I'm innocent and tell it to the jury myself. That's the way I believe.

MR. SMITH: And you think that that's what people should do if they're charged with a crime?
MR. RUSSELL: That's what I feel I should do.

MR. SMITH: Well, what about other people? You wouldn't tend to hold that against someone who wouldn't take the stand?
MR. RUSSELL: No, that'sit's

MR. SMITH: You wouldn't think, well, why didn't he?
MR. RUSSELL: I would think that, but I would close that out of my mind, because the Judge said to close it out of your mind.

MR. SMITH: Well, I mean,
MR. RUSSELL: I wouldn't consider that if that's what you're asking me. I wouldn't hold it against him.

(Emphasis supplied.)
We begin our analysis with the premise that the presumption of innocence is defeated if "a juror is taken upon a trial whose mind is in such condition that the accused must produce evidence of his innocence to avoid a conviction." Singer v. State, 109 So.2d 7, 24 (Fla.1959) (quoting Powell v. State, 131 Fla. 254, 175 So. 213, 216 (1937)). The record in this case clearly demonstrates that Mr. Russell admitted during voir dire that he has "always believed" *892 that "when someone doesn't take the stand ... they've got something to hide." As the record also reveals, he reiterated this same sentiment on more than one occasion. He also stated, however, that he could "shut that out" and that he was able to "follow [the court's] instructions." The obvious question is whether Russell's assurances that he would be able to follow instructions sufficiently negate his prior stated beliefs that it was his "honest opinion" that a defendant who does not testify must have something to hide. See generally Price v. State, 538 So.2d 486 (Fla. 3d DCA 1989) (quoting Johnson v. Reynolds, 97 Fla. 591, 121 So. 793, 796 (1929) ("It is difficult, if not impossible, to understand the reasoning which leads to the conclusion that a person stands free of bias of prejudice who having voluntarily and emphatically asserted its existence in his mind, in the next moment under skillful questioning declares his freedom from its influence. By what sort of principle is it to be determined that the last statement of the man is better and more worthy of belief than the former?")).
Based on the totality of his responses, we conclude that Russell's assurance that he would be able to follow the law did not sufficiently negate his prior abiding adherence to the notion that he had "always believed" that defendants should testify if they have nothing to hide. In reaching our conclusion, we rely on our decision in Hamilton v. State, 547 So.2d 630 (Fla.1989), which involved a juror who indicated that she had extreme difficulty with the presumption of innocence and a defendant's right to remain silent. See 547 So.2d at 632. In Hamilton, defense counsel's challenge for cause was denied, as was his request for additional peremptory challenges. See id. In reversing and ordering a new trial, this Court noted that "[a]lthough the juror in this case stated in response to questions from the bench that she could hear the case with an open mind, her other responses raised doubt as to whether she could be unbiased." Id. at 633.
Our conclusion in this case is similarly guided by the reasoning of the Fourth District Court of Appeal in Lowe v. State, 718 So.2d 920 (Fla. 4th DCA 1998). In that case, a prospective juror's statements indicated that he possessed what the court termed as an "undeniable misunderstanding of the presumption of innocence." Id. at 921. The court found error in the trial court's decision to not remove the person for cause, noting that "[t]his juror's single statement that he would acquit if the state presented insufficient evidence was tortuously teased from him only by the most pointed of leading questions. Even if it had been spontaneous, after his repeated assertions imposing on the defendant some burden to erase any idea of guilt, this single statement could not possibly evidence the correction or elimination of a view so resolutely held and repeatedly stated." Id. at 922-23; see also Huber v. State, 669 So.2d 1079, 1082 (Fla. 4th DCA 1996) ("Even though [the] prospective juror... eventually said he would be able to follow the law and require the state to prove its case beyond a reasonable doubt, his original expression of doubt about his ability to presume the defendant innocent because he believes that police don't arrest innocent people is a basis for reasonable doubt that he might not be able to render an impartial verdict. This was not overcome by his subsequent capitulation and agreement that he would follow the law as given to him by the trial court, and it was error to not dismiss [him] for cause.")
The Third District reached a similar conclusion in Gibson v. State, 534 So.2d 1231 (Fla. 3d DCA 1988), in which it remanded for a new trial after one of the *893 potential jurors stated during voir dire, "I feel if they are innocent, they can tell their side of the story to the judge." Id. at 1232. Although the juror ultimately indicated that if she had a reasonable doubt she would find the defendant not guilty, the appellate court concluded that her answers gave reasonable doubt as to whether she could render an impartial verdict. See id.
In the present case, after thorough consideration and analysis of the totality of Mr. Russell's voir dire statements with respect to the presumption of innocence and a defendant's right to not testify at trial, we conclude that his responses sufficiently placed in doubt his ability to be an impartial juror, notwithstanding the tortured attempt at rehabilitation. Accordingly, we must conclude that Mr. Russell should have been excused for cause.[13]

2. Prospective Juror Heuslein
We next address whether the cause challenge as to prospective juror Heuslein was properly denied. As previously noted, Heuslein was challenged for cause based on his views on the death penalty and awareness of the security restraints to be placed on the defendant, including a stun belt.

a. Views on the Death Penalty
The standard for determining whether a potential juror should be excused for cause based on his view with respect to the imposition of the death penalty is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). In resolving this particular issue in this case, we find guidance in our opinion in Castro v. State, 644 So.2d 987 (Fla.1994). There, Castro claimed error in the trial court's failure to excuse for cause several jurors who possessed a strong presumption in favor of the death penalty. See id. at 990. After examining the record, we found no error in the trial court's refusal to strike the prospective jurors based on their views on the death penalty. See id. Our conclusion in that case was premised on the record evidence indicating that once these jurors were advised that they were responsible for weighing aggravating and mitigating factors, they all indicated that they would be able to follow the law. See id. In doing so, we noted:
Not surprisingly, the prospective jurors had no grounding in the intricacies of capital sentencing. Some of these jurors came to court with the reasonable misunderstanding that the presumed sentence for first-degree murder was death.
Id.
Our reasoning in Castro was based on an observation we find ever present in many death penalty cases. That is, the average juror summoned for prospective service in a case where the State is seeking the death penalty enters the courtroom without any true insight whatsoever into the elements or factors involved in capital sentencing proceedings. They are overwhelmingly unaware of the existence of the bifurcated process by which defendants may be tried and ultimately sentenced to the death penalty. They similarly do not possess the requisite familiarity *894 with the necessary balancing scheme whereby aggravating and mitigating factors are weighed against each other in an effort to produce a proportionate sentence.
We made similar observations in Johnson v. State, 660 So.2d 637 (Fla.1995), a case which, like the present case, involved the trial court's failure to excuse a juror who seemed to strongly favor the death penalty, but who later noted that she thought she could follow the court's instruction with respect to sentencing. After concluding that the trial court had not abused its discretion in denying the cause challenge, we noted:
[J]urors brought into court face a confusing array of procedures and terminology they may little understand at the point of voir dire. It may be quite easy for either the State or the defense to elicit strong responses that jurors would genuinely reconsider once they are instructed on their legal duties and the niceties of the law.
Id. at 644.
The same conclusion reached in Castro and Johnson can be found in Reaves v. State, 639 So.2d 1 (Fla.1994). There, Reaves challenged the trial judge's rulings regarding two jurors who indicated that they would automatically recommend the death penalty if a defendant were found guilty of murder. Upon our examination of the record, we determined that the trial court had not abused its discretion because both jurors, after hearing an explanation as to the process of weighing aggravating and mitigating circumstances, acknowledged that they were capable of reviewing all of the evidence and following the court's instructions in considering a proper punishment. See id. at 4 n. 6.
Turning to the record before us, we conclude that the trial court did not abuse its discretion in denying Overton's cause challenge as to Mr. Heuslein on the basis of his views towards the death penalty. When voir dire examination began, Mr. Heuslein did note that he favored the death penalty in cases where the defendant is found guilty of first-degree murder. As the questioning proceeded, however, defense counsel, the State, and the trial court all explained the capital sentencing scheme and its balancing process to Mr. Heuslein. Ultimately, as noted by the trial court, Mr. Heuslein expressed a "great deference" to the trial court's instructions, and noted, on several occasions, that he would "start from a clean slate," follow the law, and abide by the sentencing scheme which required him to consider aggravating and mitigating circumstances. In fact, in response to the court's questioning, Heuslein indicated that he had no doubt that he could entertain the possibility of a life recommendation should the jury find Overton guilty of first-degree murder. Based on this record, we hold that no abuse of discretion occurred. See Bryant v. State, 656 So.2d 426, 428 (Fla.1995) (concluding that the trial court did not err in denying cause challenges where five jurors who expressed a predisposition to impose the death penalty if the defendant was convicted of first-degree murder later stated that they would follow the court's instructions and weigh the aggravating and mitigating factors to determine whether death was the appropriate sentence).

b. Knowledge of Security Restraints
Overton also asserts on appeal that the trial court erred in denying the cause challenge as to Heuslein based on the fact that he had learned through the media that the defendant was wearing a concealed "stun belt" and leg shackles.[14] Specifically, *895 Heuslein stated: "Well, the only reason I even brought that up yesterday is everybody is saying you're innocent when you come into court. Well, if he's innocent, why is he in all of these heavy restraints? Why can't he just sit there the way we sit there? That was all that I meant by that." When asked if he thought that such indicated that the defendant was not innocent, he responded: "No. I just... think it's rather weird. You're not expecting us to instantly believe a person's innocent. Why are you restraining him?" The prosecutor then explained to this juror that the standard used to determine whether someone should be arrested or which security measures to utilize is different from the standard that jurors apply in determining guilt. The juror agreed and said that he understood what the prosecutor explained and that, in any event, he "would listen to the case to really find out what really happened" because he thought "there's a lot more than the paper's putting in."
We conclude that Mr. Heuslein's responses do not indicate that he thought that the presence of the security restraints was indicative of guilt. Instead, the statements to the prosecutor regarding the restraints may be properly characterized as Heuslein's personal assessment of the paradox that although all defendants enter the courtroom clothed with the presumption of innocence, some are restrained during the guilt phase. In essence, Mr. Heuslein was expressing his personal opinion that it was inconsistent for the criminal justice system, as a whole, to emphasize that defendants are innocent until proven guilty, while simultaneously restraining some defendants during trial. Moreover, this prospective juror indicated that he understood that different standards were used to determine the necessity for restraints versus the finding of guilt, and he explicitly indicated that he would listen to, and base any decision on, the evidence presented at the trial. As a result, we conclude that the trial court did not abuse its discretion when it denied defense counsel's challenge as to Heuslein based on the prospective juror's prior knowledge of courtroom security measures.

3. Conclusion on Cause Challenges
As previously noted, because the trial court granted an extra peremptory in this case, it was necessary for Overton to establish that the trial court erred as to both Russell and Heuslein to establish reversible error. See, e.g., Watson, 651 So.2d at 1162; Cook, 542 So.2d at 969. Although we conclude that the trial court should have excused Mr. Russell for cause, we do not reach the same conclusion as to Mr. Heuslein. Accordingly, appellant has failed to demonstrate that any error as to this issue warrants reversal for a new trial.

B. STR Discovery
Overton's second issue on appeal concerns the discovery of certain documents from the Bode lab relating to the STR/DNA tests conducted in this case, namely, the lab's validation studies, the protocol manuals, and proficiency tests. According to Overton, these documents were essential to the defense DNA expert's independent assessment of the reliability of the State's test. His specific argument on appeal is that the trial court erred in not compelling discovery of these materials and in not granting a continuance so that defense counsel could review them.
We review the trial court's decision that no discovery violation occurred under an abuse of discretion standard. See State v. Evans, 770 So.2d 1174, 1183 *896 (Fla.2000); Pender v. State, 700 So.2d 664, 667 (Fla.1997). The trial judge's decision to deny the defense's motion for continuance is likewise reviewed under an abuse of discretion standard. See Scott v. State, 717 So.2d 908, 911 (Fla.1998); Gorby v. State, 630 So.2d 544, 546 (1994). Under this standard, the trial court's ruling should be sustained unless no reasonable person would take the view adopted by the trial court. See Huff v. State, 569 So.2d 1247 (Fla.1990).
Based on the record below, we conclude that the trial court did not abuse its discretion by not finding a discovery violation or by denying the motions for continuance. Primarily, the defense was aware, as early as June of 1998, that Bode would be conducting independent testing. When the final report was submitted on October 14, 1998, the trial was still approximately three months away. The defense was notified by the State at the December status conference and by Bode that the requested manuals, tests and studies were much too voluminous to copy and ship. Because of this, defense counsel and experts were invited to review the materials at the Bode lab in Virginia. The defense declined to visit the lab, phone its director (Dr. Bever), set a deposition, or even question Dr. Bever at the Frye v. United States, 293 F. 1013 (D.C.Cir.1923) hearing with respect to the information defense counsel sought. Moreover, and to be sure, the record does not indicate that defense counsel requested the continuances so that he or the defense expert could consult with the lab in Virginia. Rather, defense counsel sought the continuances in the event that the court were to grant the defense's accompanying motions to compel.[15] In sum, we determine that no abuse of discretion occurred.

C. Additional Defense Expert
As his third issue on appeal, Overton asserts that the trial court erred in not appointing an additional defense expert to rebut the State's evidence relating to the presence of Nonoxynol 9 in the bedding found at the MacIvor home. In Bates v. State, 750 So.2d 6 (Fla.1999), this Court reiterated the applicable standard when a defendant alleges error in the trial court's decision to not appoint an expert:
In evaluating whether there was an abuse of discretion courts have applied a two-part test: (1) whether the defendant made a particularized showing of need; and (2) whether the defendant was prejudiced by the Court's denial of the motion requesting the expert assistance.
Id. at 16 (quoting San Martin v. State, 705 So.2d 1337, 1346 (Fla.1997)).
Overton's particular point on appeal is that the defense needed an expert chemist to (1) conduct further testing on the bed sheet to determine whether the Nonoxynol at issue was the spermicidal form or commercial grade (i.e., the kind used in detergents), and (2) confront the state's expert's assertion that the Nonoxynol came from a detergent.
Mr. Oliver, a chemist employed by the company that is the single manufacturer of spermicidal Nonoxynol-9, testified that, as a manufacturer, his lab could possibly tell the difference, given a "significantly large sample," between spermicidal Nonoxynol-9 and commercial grade Nonoxynol-9. Oliver added, however, that once the chemical has been "put out into the environment and say, placed on other objects," there is *897 no test which can distinguish between the two types of Nonoxynol-9. After reviewing the results of the tests performed by Mr. Trager, Mr. Oliver concluded that the correct methodology was used, but that given the sample quantities extracted from the fitted sheet, there was no way to determine whether the Nonoxynol-9 found was spermicidal or commercial grade.
Although Appellant mentions in his initial brief an FBI bulletin which apparently has some information indicating that "forensic chemists do use tests to identify trace particles, lubricant ingredients, and/or spermicidal Nonoxynol from condoms," neither this bulletin, nor anything remotely similar, was brought to the trial court's attention. The only information the court had before it was both Mr. Trager's and Mr. Oliver's testimony that it was not possible to distinguish between spermicidal Nonoxynol and commercial grade Nonoxynol. This leads to the conclusion that the defendant failed to make a particularized showing of need because it was not possible to make the determination Overton sought to establish (i.e., that the Nonoxynol 9 found on the bed sheets was spermicidal in nature).
However, even if we were to assume that defense counsel did establish a particularized need for the expert to conduct a test to differentiate between these two forms of Nonoxynol-9, and further assumed that such test did exist, and that when conducted the test would indicate that the Nonoxynol-9 found on the bed sheet was spermicidal, Overton cannot establish the requisite prejudice. That is, even if the Nonoxynol-9 came from a spermicidal condom, the State argued below that Overton, in his plan to not leave behind any evidence or witnesses, could have easily used a condom, the contents of which either spilled during the forcible sexual assault or when he attempted to remove the condom. Thus, as the State contends on appeal, and as was argued at the trial, it would not have mattered whether the Nonoxynol-9 was spermicidal or commercial grade. That factor, coupled with the correct characterization that the defense failed to produce a scintilla of evidence that Detective Visco planted the seminal fluids, precludes any showing of prejudice by Overton. Accordingly, we conclude that the trial court did not abuse its discretion.

D. Motion for Mistrial
Next, Overton suggests that the trial court erred in denying his motion for mistrial after the prosecutor made statements during the State's rebuttal closing argument that the defense had requested only one Nonoxynol test, while the prosecution sought additional testing. According to Overton, this "misleading" argument suggested that the defense was hiding unfavorable evidence, and thus a mistrial was warranted.
A motion for a mistrial should be granted "only where the error is so prejudicial as to vitiate the entire trial." Hamilton v. State, 703 So.2d 1038, 1041 (Fla.1997); see also Goodwin v. State, 751 So.2d 537, 546 (Fla.1999); Cole v. State, 701 So.2d 845, 853 (Fla.1997). A trial court's ruling granting or denying a mistrial motion is reviewed under an abuse of discretion standard. See, e.g., Goodwin, 751 So.2d at 546; Hamilton, 703 So.2d at 1041; Cole, 701 So.2d at 853. With respect to improper arguments made by prosecutors, this Court has held that there is no abuse of discretion in denying a motion for mistrial where the prosecutor's argument constitutes a fair comment on the evidence. See, e.g., Monlyn v. State, 705 So.2d 1, 4-5 (Fla.1997) (finding prosecutor's comment that the defendant "would have done [the victim] a big favor if he had *898 shot him. It would certainly have been a less painful death" to be proper comment on the evidence where defendant beat victim to death with a shotgun).
Here, during defense counsel's direct examination of Mr. Trager, the chemist from Consumer Products Testing Company, defense counsel inquired whether the tests conducted by Trager supported the State's theory that the Nonoxynol 9 present in the bed sheet was simply residue after the sheet had been washed with a household detergent. Trager testified that to make such a determination would require the distribution of Nonoxynol 9 to be fairly uniform and that he would probably recommend more testing in this case because he could not conclude one way or the other.[16] During cross-examination, Trager testified that the defense had asked him to test only one spot, and that when Trager informed defense counsel that the State had submitted two additional cuttings for confirmatory testing, the defense attempted to prohibit Trager from performing the additional tests (presumably because defense counsel considered Trager a defense expert).
During the defense's closing argument, counsel stated:
You have semen plus Nonoxynol raises the specter of planting significantly. Those were his direct words. And that has not been dispelled by any expert, by any testing because, as all of these experts said, well, we need more testing, more testing, more testing.
The State, during its rebuttal, stated:
We talked about the condom and that more testing is needed. The State didn't do enough testing. Who asked for only one test. The State did more testing
At that point, defense counsel objected and requested a mistrial, arguing that the prosecutor's statement was a mischaracterization of the evidence which would mislead the jury. The trial court disagreed and denied the motion for a mistrial.
Based on the evidence introduced at trial (i.e., that the defense submitted one sample for testing and attempted to prevent Trager from performing the additional confirmatory tests (for whatever reason)), we conclude that the prosecutor's statement during rebuttal that the defense only requested one test and that the State sought confirmatory testing was a proper comment on the evidence introduced at trial. Moreover, because defense counsel argued during closing that more testing was needed, we conclude that the State should have been able to rebut that argument by noting that the defense only submitted one sample for testing and that the State sought to have more confirmatory tests performed. Accordingly, we do not conclude that the trial court abused its discretion in denying the motion for mistrial because the prosecutor's statements were a proper comment on the evidence and any potential error was not "so prejudicial as to vitiate the entire trial."

E. Testimony of Prison Chaplain
We next consider whether the trial court allowed the State to improperly bolster testimony of Zientek through the alleged hearsay testimony of the prison chaplain. As is further detailed in the facts, Zientek testified as to conversations he had with Overton relating to the crimes. Apparently, at some point during his direct examination, *899 Zientek became emotional and his eyes teared up while describing some of the materials he reviewed. He indicated during direct examination that when he saw one of the autopsy pictures he vomited and that he was "pretty freaked out about the whole thing.... It was bothering me. I wanted to get a hold of the chaplain...." During cross-examination, defense counsel asked: "And in fact, you, before when you were looking disturbed and shedding tears, that was an act, wasn't it?" Defense counsel further attacked Zientek's testimony that he had "vomited" when he saw some of the pictures shown to him by Overton and that instead he "thanked" Overton for showing him the pictures and other materials.
The State then presented the jail chaplain, Judith Remley. Defense counsel objected on the basis that this witness's testimony was "improper vouching and ... not relevant." The prosecutor argued that Chaplain Remley's testimony would solely relate to Mr. Zientek's demeanor when he spoke to her, and the record reveals that this is exactly what occurred. Specifically, during Ms. Remley's brief direct examination, she was asked: "What was his [Zientek's] demeanor when he came to talk to you about that conservation?" She replied, "He was very upset. He was crying. He was devastated."
First, we conclude that the issue is properly preserved because we believe the trial court was "fairly apprized" of the relief sought and the grounds for the objection. See Filan v. State, 768 So.2d 1100 (Fla. 4th DCA 2000) (quoting section 924.051(1)(b), Florida Statutes (1999)). Turning to the merits, we decline to address whether the chaplain's testimony was inadmissible hearsay introduced for purposes of bolstering Zientek's credibility because we conclude that any error which may have occurred was harmless beyond a reasonable doubt. See Chandler v. State, 702 So.2d 186, 198 (Fla.1997) (holding that improper admission of prior consistent statement is subject to harmless error analysis); Anderson v. State, 574 So.2d 87, 93 (Fla.1991). In this case, Zientek's testimony that Overton admitted committing the crimes, which was presumably bolstered by the chaplain's hearsay statement, was not the sole evidence identifying the defendant as the perpetrator. The DNA evidence, consisting of the results from two separate tests, identified Overton as the person who committed these crimes. Overton's involvement in these murders was further corroborated by the other cell-mate to whom Overton confessed the crimes, Guy William Green. Moreover, the jury had the benefit of seeing Zientek testify and, therefore, with or without the chaplain's testimony, they were able to assess his credibility. In sum, we find no harmful error in the trial court's admission of the chaplain's testimony.

F. Internal Affairs Complaint Against Detective Visco
As already noted, the defense's hypothesis of innocence at trial was that the seminal fluid found on the bedding at the crime scene had been planted. The defense suggested that Detective Chuck Visco, from the Monroe County Sheriffs Office, planted the evidence. According to the defense, Visco's motive generated from an internal affairs complaint that Overton filed against Detective Visco for "stealing" Overton's vehicle. Detective Visco was ultimately cleared of the charges in that complaint.
The events leading to the complaint occurred when Overton's car was impounded and towed to the police station based on a traffic violation. Once there, the contents were inventoried, and Detective Visco, who was then the lead investigator in the murder *900 of Rachelle Surrett, was called because there were apparently some suspicious items inside the vehicle. Based on these items, Detective Visco obtained a search warrant for the vehicle. Inside the vehicle, Detective Visco found a "kit" similar to that which Green testified that Overton confessed to using when committing burglaries. The vehicle was held for an unspecified period of time in conjunction with the Surrett murder investigation. Overton was never arrested in connection with the Surrett murder.
At trial, the defense suggested to the court that it would not object to Detective Visco explaining that the complaint was unfounded or that he was cleared of any charges. However, defense counsel sought a ruling from the court that although the defense could question Detective Visco as to the filing of the complaint, the State could not inquire as to the circumstances surrounding the complaint. Particularly, the defense sought to eliminate any reference in this case to the Surrett murder investigation.[17] The State, on the other hand, asserted that to not allow an explanation of the surrounding circumstances would leave the false implication that, although he was cleared by the agency, there might have been some truth to the complaint filed by Overton. The prosecutor added: "To imply that he [Detective Visco] had some sinister motive to fabricate evidence against the defendant in this case without him being able to talk about that ... valid, genuine investigation... tells half." The trial judge ruled that defense counsel was free to question Detective Visco as to the internal affairs complaint, but that he would permit Visco to explain the context within which it arose.
First, we determine that the issue was properly preserved. Addressing the merits, the trial court's decision to allow the State to question Detective Visco as to the circumstances giving rise to the complaint if defense counsel questioned the detective about the complaint, does not constitute an abuse of discretion. To be sure, the trial court did not prevent defense counsel from questioning Detective Visco about the complaint. The judge simply ruled that if defense counsel "opened the door" by asking questions relating to the complaint, the State would be allowed to question the detective, during its cross-examination, about the circumstances surrounding the complaint.
"As an evidentiary principle, the concept of `opening the door' allows the admission of otherwise inadmissible testimony to `qualify, explain, or limit' testimony or evidence previously admitted." Ramirez v. State, 739 So.2d 568, 579 (Fla. 1999) (quoting Tompkins v. State, 502 So.2d 415, 419 (Fla.1986)); see also Rodriguez v. State, 753 So.2d 29, 42 (Fla.2000) (holding that where defendant sought to establish that witness disliked him and was biased against him, the State was allowed to ask questions which would shed light on the reasons for the possible bias or dislike, which included question relating to the witness's knowledge that the defendant had engaged in random acts of violence and blackmail). The notion of "opening the door" is premised on "considerations of fairness and the truth-seeking function of a trial." Ramirez, 739 So.2d at 579 (quoting Bozeman v. State, 698 So.2d 629, 631 (Fla. 4th DCA 1997)); see also McCrae v. State, 395 So.2d 1145, 1151 (Fla.1980) (holding that prosecutor was entitled to inquire into exact nature of a prior felony conviction where defense counsel sought to establish that that prior conviction was inconsequential); Washington v. State, 758 So.2d 1148, 1155 (Fla. 4th DCA 2000) *901 ("[F]alse impression permitted the state to fill in the gaps in the truth so tactfully omitted during cross-examination.").
In this case, defense counsel's reason for questioning the detective about the internal affairs complaint was to bolster the defense's position that the detective was biased against the defendant and therefore had a motive to plant the evidence. The facts indicate that the car was detained by Detective Visco during an unspecified period of time for a traffic violation. To have prevented the detective from explaining why the vehicle continued to be impounded for a mere traffic-related transgression would have given rise to a false implication (i.e., that the detective continued to hold the vehicle because of some of bias or improper motive against Mr. Overton and not because it was part of an ongoing criminal investigation). As a result, we conclude that the trial court did not abuse its discretion in ruling as it did.

G. HAC as to Michael MacIvor
Michael MacIvor's death was caused by ligature strangulation. This Court has held on numerous occasions that "it is permissible to infer that strangulation when perpetrated upon a conscious victim, involves the foreknowledge of death, extreme anxiety and fear, and that this method of killing is one to which the factor of heinousness is applicable." DeAngelo v. State, 616 So.2d 440, 442 (Fla. 1993) (quoting Tompkins v. State, 502 So.2d 415, 421 (Fla.1986)). In fact, we have noted that "[o]ur case law establishes... that strangulation creates a prima facie case for [HAC]." Orme v. State, 677 So.2d 258, 263 (Fla.1996); see also Hitchcock v. State, 578 So.2d 685, 692 (Fla.1990) ("[S]trangulations are nearly per se heinous."). Because the evidence in this case clearly establishes that Michael was strangled to death, the question which remains is whether he was conscious at the time of the strangulation. The record evidence leads us to the conclusion that he was.
It is clear from the testimony at trial that Michael MacIvor struggled with Overton prior to his death. Particularly, the evidence demonstrates that Michael was first struck in the back of the head, the neck, and the left shoulder area. It was at this point that Susan came out of the bedroom screaming. Overton chased her back into the bedroom where he restrained, raped and strangled her. Throughout this time, he was "concerned about the male just being temporarily knocked out." As a result, he returned to the living room "where the male was apparently just becoming conscious." Overton then kicked Michael in the abdominal area "to disable him" and "strangled [him]." We find Overton's last act of violence prior to the strangulation particularly instructive in reaching our conclusion that Michael was conscious at the time the strangulation began. After all, why would Overton find it necessary to "disable" Michael by kicking him in the abdominal area if he was already unconscious? See, e.g., Scott v. State, 494 So.2d 1134, 1137 (Fla. 1986) (upholding HAC, concluding that where victim was "beaten a second time," evidence "clearly supports the ... conclusion that at some point the victim regained consciousness"). Accordingly, we affirm the trial court's HAC finding.

H. Jury Instructions
Next, Overton claims that the trial court erred in not instructing the jury that it should use great caution in relying on the informants' testimony. Issues pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial. See, e.g., Archer v. State, 673 So.2d 17, 20 (Fla. 1996); Armstrong v. State, 642 So.2d 730 (Fla.1994). Overton candidly admits that no such request for a limiting instruction *902 relating to the credibility of "snitch" testimony was requested. Nevertheless, he suggests to this Court that the failure to give such instruction was fundamental error.
Fundamental error is defined as the type of error which "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998) (quoting Kilgore v. State, 688 So.2d 895, 898 (Fla. 1996)). In this case, the State relied on the evidence presented during the guilt phase to establish the specific aggravating factors it submitted for consideration during the penalty phase. During the guilt phase, jurors heard the standard jury instruction with respect to the credibility of witnesses, which, among other things, informed the jurors that they could consider whether the witness had been previously convicted of a crime and whether he had received some form of preferential treatment in exchange for his testimony. Thus, the jury was free to consider the informants' criminal records and any possible benefit derived in evaluating whether their responses were truthful. Accordingly, no error, much less that of a fundamental nature, occurred.

I. Consideration of Mitigating Evidence
As his last issue on appeal, Overton maintains that the trial court erred in not considering certain available mitigation. Because Overton declined the opportunity to present mitigating evidence, our opinions in Koon v. Dugger, 619 So.2d 246 (Fla.1993), and Farr v. State, 621 So.2d 1368 (Fla.1993), are instructive. In Koon, we detailed the procedures to be followed when a defendant elects to not present mitigating evidence during the penalty phase:
[1] [C]ounsel must inform the court on the record of the defendant's decision. [2] Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. [3] The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.
619 So.2d at 250. Moreover, we added in Farr:
We repeatedly have stated that mitigating evidence must be considered and weighed when contained anywhere in the record, to the extent it is believable and uncontroverted. That requirement applies with no less force when a defendant argues in favor of the death penalty, and even if the defendant asks the court not to consider mitigating evidence.
621 So.2d at 1369.
Turning to the record before us, we note at the outset that the procedures required by Koon were satisfied. First, defense counsel informed the trial court that Overton did not wish to present any mitigating evidence. Counsel specifically advised the trial court that "over the past two years" Overton had been steadfast in his position that if he were convicted, he "did not want any mitigation being presented on his behalf in any manner whatsoever." Defense counsel added that the defense had prepared a memo for the court outlining "things that we could have brought out in mitigation." The judge then inquired what type of mitigation was "ferreted out or pursued." Defense counsel responded, "Well, the family background, any type of *903 mental defense or mental mitigation, we attempted to pursue that. Mr. Overton didn't want any of that on. There were some allegations of drug abuse that may have been able to be presented if that was pursued." Defense counsel added that "from the very beginning Mr. Overton had advised family and friends not to cooperate with any investigations as far as the penalty phase."[18] At that point, the trial court inquired of Overton whether he in fact wished to not present any mitigating evidence. The defendant replied: "No, I don't want any mitigation." The trial court explained to Overton the procedures that would take place during the penalty phase. The defendant stated on the record that his reasons for not wanting the presentation of mitigating evidence were: (1) "I didn't commit the crime";[19] (2) "I trust the appellate system. I figure I'm going to have a chance to have it reversed"; and (3) "I'm not going to put my family and friends though this stuff." The judge assured the defendant that: "[I]f you have any misconception that mitigation would somehow undermine your position on appeal, that's not so" and "[y]ou don't have to expose those people you choose to insulate from the stresses and pressures of this sort of proceeding. You can still insulate them and present mitigation through other forms of evidence." The defendant responded: "But if this had happened to some member of my family or some friends, I wouldn't care if the guy drank too much sugar or salt or what they said when he was a kid, there's no excuse for what happened...." Overton further affirmed that his attorneys had tried to convince him to present mitigating evidence, but that he had instructed his family and friends to not cooperate. Overton laughed when the judge asked whether someone had promised him anything to entice him to give up "this important right." He simply added: "I'll just take it to the appellate court." The judge again advised the defendant: "I just can't help but point out to you what I believe to be some of the fundamental flaws in your reasoning process, because you do not necessarily, again, compromise any appellate issues [by presenting mitigating evidence]." Overton added that he was "fully aware of what's going on" and that he "know[s] a lot about the process in the courts and what [he] didn't know, Mr. Smith and Mr. Garcia has [sic] explained it to me. They're not real happy with my decision, but it is my decision."
The court handled other related matters and again questioned the defendant as to his decision to not present mitigating evidence, and the defendant, once again, stated on the record that he did not wish to present any evidence in mitigation. The court ultimately concluded that the defendant had "made a knowing, voluntary decision even in the face of advice from competent counsel to the contrary."
At the Spencer hearing,[20] the trial court inquired about a "memorandum regarding mitigation." Defense counsel stated: "Judge, after conferring with Mr. Overton he didn't want us to do that ... at least until after the sentencing is completely over. He didn't want anything in the record that would tend to sway the Court." *904 The judge once again engaged the defendant in a lengthy discussion regarding his decision to not present mitigating evidence. The judge explained to him that although he had declined to present any evidence during the penalty phase, he was still able to present any matter he wanted the judge to consider at the Spencer hearing. The defendant again declined to do so, and firmly stated that he did not wish to present any evidence at that time. The trial judge thought it would be best to again place on the record what information had been pursued by defense counsel, at which point Overton's attorney stated: "We have had our investigator attempt to contact Mr. Overton's family members, in order to go into his background and also his friends, his prior military school, history and there was some indications from the discovery that we received from the State that there were areas of inquiry regarding his past military background, school background, and his past health, medical record issues, and that's what we basically pursued and attempted to pursue." The Court again questioned Overton about his decision and asked: "So do you understand that there is apparently some relevant information out there that you yourself are precluding the Court from having evidence about? Do you understand that?" Overton responded affirmatively. The court concluded that Overton had made a knowing and voluntary waiver at that time.
At the sentencing hearing, the trial court stated that it had "considered the presentence investigation [report] ["PSI"] solely for the purpose of uncovering possible mitigating factors."[21] The trial court further noted:
This Court did not let the matter rest after the [Koon] inquiry in chambers prior to the commencement of the penalty phase, rather, repeatedly, at various times during the penalty phase, outside the jury's presence, the Court conducted an additional inquiry of the defendant regarding his rights to present mitigation. The Court also repeated the process during the [Spencer hearing]. The Court also requested a presentence investigation [report], but the defendant refused to cooperate with the Department of Corrections.
Despite this choice by the defendant, this Court has endeavored to uncover whatever mitigation may exist. Accordingly, the Court will now address, and has addressed in its order, the statutory mitigating factors that may exist.
As noted above, the defendant did not request that the jury be instructed on any statutory mitigating factors, nor did he present any evidence or argument before this Court at the separate sentencing hearing to suggest any statutory mitigating factor. This Court has reviewed each statutory mitigating factor and now finds that no evidence has been presented to support any statutory mitigating factors and none exist.
Nevertheless, the Court has carefully considered the possibility that other factors exist in the defendant's background that would mitigate against imposition of the death penalty pursuant specifically to Section 921.141(6)(h), Florida Statutes, and discusses these possibilities in its sentencing order specifically. And once again the analysis of these possible mitigating factors is embodied in the *905 order, but I will recite those that I considered in conjunction with 921.141(6)(h), specifically family background, military record, employment record, history of substance abuse, mental health. And the Court, after thoroughly analyzing the possibility that some mitigation may exist in these areas, has found none to exist.

Nonstatutory mitigating factors also must be considered when weighing the sentence to be imposed in this case, and despite the defendant's refusal to present evidence of any nonstatutory mitigating factor, the Court has identified the following nonstatutory mitigating factors:
The defendant will be incarcerated for the rest of his life with no danger of committing any other violent act.... [H]owever, the Court gives that little weight.
Defendant's courtroom demeanor and behavior are also a nonstatutory mitigating factor that the Court can consider, and the Court has considered that and does find that that nonstatutory mitigating factor does exist and does accord it some weight.
(Emphasis supplied.)
The trial court sentencing order, which mirrors the trial court's oral pronouncements during the sentencing hearing, indicates that the trial judge in fact considered whatever mitigation was present in the record, including the limited information contained in the PSI report. The postguilt phase record in this case is indicative of a judge who conscientiously and deliberately examined the information available to him, while at the same time respecting the wishes of the defendant. Based on this record, we conclude that the trial court committed no error with respect to its consideration and evaluation of the available mitigating evidence.

J. Sufficiency of the Evidence and Proportionality
Overton did not raise either of these two issues on appeal. However, based on our independent obligation to review the record, we find the evidence sufficient to support each conviction. We further conclude that, although not raised by the defendant, the death penalty is proportionate as to both victims. See, e.g., Reese v. State, 768 So.2d 1057 (Fla.2000) (upholding death sentence where victim was strangled to death; court found following aggravators: HAC, CCP and during the course of a sexual battery; trial court did not find any statutory mitigators and gave minimal weight to nonstatutory mitigator (no significant criminal history)); Mansfield v. State, 758 So.2d 636 (Fla. 2000) (affirming death sentence where victim was strangled to death; trial court found following aggravators: HAC and during the course of a sexual battery; trial court found no statutory mitigation and several nonstatutory mitigators (good conduct during trial, defendant was an alcoholic, defendant's mother was alcoholic during childhood, poor upbringing, dysfunctional family, and brain injury due to head trauma and alcoholism)); James v. State, 695 So.2d 1229 (Fla.1997) (affirming death sentence where victim was strangled to death; court found HAC, prior violent felony conviction (based on contemporaneous murder), and during the course of a felony; trial court also found significantly more mitigation than that found in this case (ability to appreciate criminality of conduct was substantially impaired, under the influence of moderate mental or emotional disturbance at the time of offense, full cooperation with authorities, genuine shame and remorse, good conduct while incarcerated)); Jennings v. State, 718 So.2d 144 (Fla.1998) (affirming death penalty where trial court found following aggravators: *906 CCP, avoid arrest, and during the commission of a felony; one statutory mitigator (no significant history of prior criminal activity); and nonstatutory mitigation included cooperation with police, deprived childhood, good employment history, exemplary courtroom behavior); Consalvo v. State, 697 So.2d 805 (Fla.1997) (upholding death penalty where trial court found murder was committed during the course of a burglary and to avoid arrest; no statutory mitigation; and slight nonstatutory mitigation (employment history and abusive childhood)).

III. CONCLUSION
In conclusion, we affirm Overton's first-degree murder convictions and death sentences. We also affirm his convictions and sentences for sexual battery, burglary, and the unlawful killing of an unborn child.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] The doctor testified that the ligature marks were indicative of "a rope wrapped around four times or wrapped around twice and reapplied once or wrapped around once and reapplied four times."
[2] Cuttings were not sent to the FDLE immediately after Dr. Pope detected the presence of sperm cells because at that time (i.e., 1991-92), the FDLE had recently begun the process of DNA testing and their protocol did not allow for testing in cases where there was not a suspect.
[3] The doctor provided the following explanation as to why the luma light indicated the presence of presumptive seminal fluid and why no sperm cells were found on the swabs: "The body is forever degrading and the most important thing that we're looking for in seminal fluid itself is the sperm cells, and remember, I toldI mentioned that the body itself was moist and it already was exuding a liquid. You're in a hot, hot environment. You're in a very humid environment. It had been raining off and on all that day. With those factors, those things cause the seminal fluid to basically decompose or degrade rapidly and so it was really not a big surprise when I got to this stage that there was no sperm." A similar explanation was provided by the forensic serologist from the FDLE.
[4] Overton was never arrested in connection with the Surrett murder.
[5] Police were not sure whether Overton was attempting to commit suicide, or whether this was a ploy to attempt an escapesomething he had tried previously several years earlier while at another institution.
[6] Dr. Pollock testified that since he had initially conducted the DNA extraction process in 1993 (when lab only had capabilities to examine five loci), the FDLE lab had been able to examine one additional locus by 1996.
[7] The defense argued that Detective Visco's alleged motivation to plant the evidence was based on an internal affairs complaint which Overton at one point filed against Visco, but from which Visco was eventually cleared.
[8] Detective Visco had spoken on several occasions with Lorna Swaybe, Overton's girlfriend. The testimony was not clear as to when these conversations occurred or what the nature of the conversations had been. Ms. Swaybe died in 1994, and Detective Visco testified that he never received any seminal fluids from Ms. Swaybe.
[9] The testimony indicates that these new cuttings came from sections in the sheet which were not alleged to contain any seminal fluids. The State was attempting to prove that the Nonoxynol-9 found was present as residue from laundry detergent (which also contains Nonoxynol-9).
[10] Trager's testimony indicates that some amount of Nonoxynol 9 was found in this second sample, but that the amount was not sufficiently significant so as to be recognized by the lab's equipment.
[11] The trial testimony leads to the conclusion that no seminal stains were found on the comforter.
[12] The only condoms found at the scene were thought to belong to the victims because the package was located inside a small basket in their bedroom along with a tube of K-Y Jelly, Vaseline, and body lotion. These condoms were not spermicidal; therefore, they did not contain Nonoxynol-9.
[13] Because we determine that Russell should have been dismissed for cause based on his views on the presumption of innocence and right to remain silent, we decline to address whether the trial court erred in not dismissing Russell for cause on alternative bases (i.e., his awareness of security measures and his prior knowledge of facts not introduced at trial).
[14] To be sure, the record indicates that the stun belt remained concealed underneath Overton's shirt throughout all of the proceedings, and that great efforts were undertaken to ensure that the prospective venire members would not see the defendant in shackles.
[15] This case had been originally set for trial in October 1997, but was continued on three occasions (two joint and one defense continuance), and did not begin until January 11, 1999.
[16] To reiterate, Trager found 53 micrograms in the sample submitted by the defense and 50 micrograms in one of the samples submitted by the State, and he was unable to tell the exact amount in the second sample submitted by the State because it was below that lab's reporting level.
[17] The defense's argument below never sought to exclude mention of the burglary kit.
[18] Defense counsel submitted an affidavit from an investigator who spoke to the defendant's mother who indicated that, at her son's request, she would not speak with them.
[19] "THE DEFENDANT: Any mitigation factors that come up, there's my back history, my drug abuse and everything, that's an excuse that somebody who's guilty would use. They say, well, I shouldn't be punished because I didn'tbecause all this is my background. That doesn't apply to me."
[20] Spencer v. State, 615 So.2d 688 (Fla.1993).
[21] Although our recent decision in Muhammad v. State, 782 So.2d 343 (Fla.2001) (requiring preparation of a PSI in every case where the defendant is not challenging the imposition of the death penalty or refuses to present mitigating evidence) was prospective, and thus not applicable to Overton's case, we note that the trial court's decision to order the preparation of a PSI in this case is consistent with our decision in Muhammad.