703 So.2d 1038 (1997)
Richard Eugene HAMILTON, Appellant,
v.
STATE of Florida, Appellee.
No. 86021.
Supreme Court of Florida.
October 23, 1997.
Rehearing Denied January 8, 1998.
*1040 Nancy A. Daniels, Public Defender and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General and Carolyn M. Snurkowski, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Richard Eugene Hamilton. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.
Richard Hamilton and Anthony Wainwright escaped from a North Carolina prison, stole guns and a Cadillac, and headed for Florida. When the car overheated, April 27, 1994, in Lake City, Florida, they abducted Carmen Gayheart, a young mother of two, at gunpoint from a Winn-Dixie parking lot as she loaded groceries into her Ford Bronco. The men stole the Bronco and proceeded north on I-75. They raped, strangled, and executed Gayheart by shooting her twice in the back of the head. The men were arrested the next day in Mississippi following a shootout with a trooper.
Hamilton gave several statements to police wherein he admitted kidnapping, robbing, and raping Gayheart, but he claimed Wainwright strangled and shot her. Wainwright, on the other hand, admitted participating in the kidnapping and robbery, but asserted that Hamilton raped and killed her. Hamilton was charged with first-degree murder, sexual battery, robbery, and kidnapping, all with a firearm, and was found guilty as charged. During the penalty phase, Hamilton called two relatives and a friend, who testified that he grew up in a dysfunctional family in a poor neighborhood, and was shot in the eye with a BB gun as a child. The jury recommended death by a ten-to-two vote and the judge imposed a sentence of death based on six aggravating circumstances,[1] no statutory mitigating circumstances, and five nonstatutory mitigating circumstances.[2] Hamilton raises nine issues on appeal.[3]
*1041 At trial, the defense attempted to portray co-perpetrator Wainwright as the "bad guy" and true killer, and presented testimony of inmates to whom Wainwright had confessed, in a bragging way, that he was the shooter. On rebuttal, the State presented the testimony of Wainwright's cellmate, Robert Murphy, in an attempt to show that Wainwright's self-inculpatory claims were not to be believed because he had made similar claims about shooting the Mississippi trooper (and this was patently untrue). The following transpired:
Q. Did he say whether or not she [Gayheart] was naked or clothed when she was killed?
A. Naked.
Q. Did he tell you that he killed anybody else?
A. He did. He mentioned something about after they had escaped on the way down from wherever they had escaped from, South Carolina, or North Carolina, somewhere, that they run across some black people, a drug dealer or whatever, they robbed and killed them. He didn't go into no detail about that. That was about it.
....
MR. HUNT: Judge, I object to the testimony solicited from the witness that, on the grounds that it is testimony that the defendant was involved in a murder for which he has not been accused, for which the State has not offered any prior indication they would offer evidence.
MR. DEKLE: I didn't know he was going to say that.
....
MR. DEKLE: ... I expected Mr. Murphy to testify to the killing of a Mississippi State highway patrolman, and I was quite surprised by what he said. I was offering that testimony to show that Mr. Wainwright is a bald faced liar.
The court offered to instruct the jury that there had in fact been no other murder, but defense counsel balked, claiming that this would bolster the State's theory that Wainwright was a "bald faced liar." After some discussion (and with the approval of both sides), the court gave the following curative instruction: "Members of the jury, you are to disregard the last statement by this witness. It is not to play any part in your decision in this case." Hamilton now claims that Murphy's improper statement concerning the fictional murder requires reversal. We disagree.
A mistrial is appropriate only where the error is so prejudicial as to vitiate the entire trial. See, e.g., Buenoano v. State, 527 So.2d 194, 198 (Fla.1988). A ruling on a motion for mistrial is within the trial court's discretion. See, e.g., Merck v. State, 664 So.2d 939, 941 (Fla.1995). In the present case, the improper comment was unanticipated by the State and was brief. The court offered to instruct the jury that there had been no other murder but defense counsel declined. An alternative instruction was given. On this record, we cannot say that the court abused its discretion in denying the motion for mistriali.e., reasonable persons could agree with the trial court's ruling. See Huff v. State, 569 So.2d 1247, 1249 (Fla. 1990). We find no error.
During Murphy's testimony, the prosecutor attempted to elicit from Murphy his earlier version of the crime wherein Murphy said that Wainwright told him that "we strangled her." The following transpired:
Q. What did he tell you?
A. He told me that him and his partner had broke out of prison and come down to Florida and run up on this lady at some sort of store or something, and abducted her and her truck or van, whatever it was, vehicle, and took her to the woods, and had sex with her and this and that. And then Wainwright had her get out of the truck and lay in front of it on the ground buck naked, and commenced to strangle her. And what he told me that she didn't die. I said, "What do you mean, she didn't die?" You know, he said, "Well, like when you hit *1042 a puppy in the head and it kind of kicks before it dies, that's what she was doing. And that's when I shot her in the back of the head twice and drug her off in the ditch."
Q. Did he say, "I strangled her," or "we strangled her"?
A. He said, "I strangled her."
Q. Are you sure about that?
A. I think so, yes.
Q. Do you recall being interviewed at the Taylor County Correctional Institution on February the 23rd?
MR. HUNT: I object, and ask to approach.
At that point, defense counsel argued that the State was improperly impeaching its own witness, and the prosecutor countered by saying that he was simply trying to refresh Murphy's recollection with his prior inconsistent statement. The court allowed the inquiry to continue and Murphy eventually explained that he may have said "we" at the earlier interview but currently could not remember. Hamilton now claims that the above dialogue constituted improper testimony because the impeachment served as "mere subterfuge" for getting the prior inconsistent statement before the jury. See generally § 90.608, Fla. Stat. (1995). We disagree.
Hamilton's argument is belied by both the record and his own brief. The record contains no indication whatsoever that the prosecutor knew ahead of time that Murphy would say, "I strangled her," instead of "we strangled her." There is nothing in the transcript of the proceeding that would have alerted the trial court to this possibility. Further, Hamilton's brief concedes as much: "In this case, Murphy's testimony that only Wainwright strangled Gayheart differed from what the prosecutor expected him to say: that Wainwright and Hamilton had strangled her." On this record, we cannot say that the trial court abused its discretion in concluding that the prosecutor was proceeding in good faith. See Huff v. State, 569 So.2d 1247, 1249 (Fla.1990). We find no error.
On cross-examination of State witness Robert Kinsey (a law enforcement officer to whom Hamilton had given a statement), defense counsel inquired at length about Hamilton's account of the crime. On redirect examination, the prosecutor elicited testimony showing that whereas Hamilton had told Kinsey that he had thrown the murder weapon away near Colquit, Georgia, the weapon in fact had been found near Quitman, many miles away. Hamilton now claims that this inquiry was an improper attempt to show that he was a liar. We disagree. The record shows that the prosecutor's inquiry constituted a fair exploration of the accuracy of Hamilton's statement as it related to the facts and circumstances of the crime. Cf. § 90.404, Fla. Stat. (1995) (excluding character evidence in general). We find no error.
Hamilton claims as his fourth point that he is entitled to a new trial because the court refused to give his requested instruction on withdrawal. We disagree. The standard for giving an instruction on withdrawal is as follows:
To establish the common-law defense of withdrawal from the crime of premeditated murder, a defendant must show that he abandoned and renounced his intention to kill the victim and that he clearly communicated his renunciation to his accomplices in sufficient time for them to consider abandoning the criminal plan. For a defendant whose liability is predicated upon the felony murder theory, the required showing is the same and the defense is available even after the underlying felony or felonies have been completed. Again the defendant would have to show renunciation of the impending murder and communication of his renunciation to his co-felons in sufficient time to allow them to consider refraining from the homicide.
....
Appellant correctly points out that a defendant is entitled to have the jury instructed on the rules of law applicable to his theory of defense if there is any evidence to support such instructions. If there is any evidence of withdrawal, an instruction should be given. The trial judge should not weigh the evidence for *1043 the purpose of determining whether the instruction is appropriate. Appellant's pretrial statement [wherein he said that he tried to talk the codefendant out of the murder], however, testified to by a state witness, seems hardly sufficient to raise the issue of withdrawal in view of the above-discussed facts. Without formulating any general harmless error rule regarding improper denial of instructions on defenses, we hold that here the error, if any, was harmless. No new trial is required.
Smith v. State, 424 So.2d 726, 732 (Fla.1982) (citations omitted) (emphasis added).
As evidence of withdrawal, Hamilton points to several statements made by witnesses evincing Hamilton's intent to let Gayheart go.[4] We note, however, that the source of most of these statements was Hamilton himself, and most were not expressions of an intent to withdraw made to an accomplice but were reassurances made to the victim. Such self-serving statements are entirely consistent with a plan to kill (i.e., to mollify the victim), and do not qualify as evidence of withdrawal under Smith.[5] The record shows that a focus of Hamilton's defense at trial was not that he withdrew from a plan to kill, but rather that he knew nothing of any such planthat Wainwright's act surprised him. Error, if any, was harmless. Cf. id. at 732 ("[W]e hold that here the error, if any, was harmless.").
The prosecutor made the following comments during his closing arguments (the first three comments were made in the guilt phase and the fourth in the penalty phase):
She was kidnaped, raped, murdered. And her only crime was to stop off at the store to pick up dog food and pizza. For this sin, she lost everything. She lost her car, her clothing, her dignity, and her life. The loss that concerned her the most, the loss that tormented her mind as her captors tormented her body, was the loss of her children. In those final moments of her life, that was what she talked about was her children.
....
By bringing her to the point of death, you know, he assumed a little bit of the responsibility, assuming what he says is true. There was a 30-30 there. There was a .16 gauge shotgun there. If he wanted
....
[Hamilton] shot at [Mississippi State Trooper] John Leggett because at that time Wainwright happened to be driving and he couldn't shoot. And in the final analysis that probably dictated who shot Carmen Gayheart that first time.
....
... And, you know, it occurred to me that someone else argued a mitigating circumstance very similar to that back on April the 27th, when Carmen Gayheart was kidnapped, and she said, "Please don't kill me, I'm a wife and I'm a mother."
Hamilton claims as his fifth point that the above comments were improper and require a new trial. We disagree. As for the first comment, the record reflects that each statement contained in this comment was based on evidence presented at trial: Hamilton admitted that he was a kidnapper and rapist; his statement to police shows that Gayheart told them she had children and asked them not to kill her; and both Hamilton's and Wainwright's statements reveal that she was crying and concerned about her children. The statements thus were fair comment on the evidence. As for the second and third comments, the trial court found both to be *1044 fair comment on the evidence, and the record shows no abuse of discretion. See generally Huff, 569 So.2d at 1249. And finally, as for the fourth comment, the court gave a proper curative instruction. We find no error.
The State called Carolyn Hosford, the owner of Country Kids Daycare, who testified that Gayheart always picked her two children up by 12:30 p.m. because that was the cutoff time for a half-day of daycare fees, but that she did not pick them up on time on the day of the murder. The trial court overruled defense counsel's objection, finding that the inflammatory nature of the testimony was outweighed by its probative value, i.e., it was relevant to establish both the time of the crime and the existence of non-consent, an element of kidnapping. The record shows no abuse of discretion. Id. We find no error.
When first arrested, Hamilton was treated at a local hospital for injuries sustained in the shootout with police, and the following day, April 29, officers approached him in the hospital and advised him of his rights. Hamilton signed a form acknowledging the warning but refused to sign a waiver. Officers spoke with him tentatively and he did not give a statement. Later that day, Hamilton was moved to the local jail, and about four hours after the initial interview in the hospital, officers again approached him, advised him of his rights, and this time obtained a taped inculpatory statement. Police later obtained additional inculpatory statements, always after advising him of his rights and obtaining a valid waiver. Hamilton claims that the court erred in admitting these statements because during the initial interview he told officers he did not want to speak to them and they failed to "scrupulously honor" his request. We disagree.
The record shows that the testimony at the suppression hearing concerning the initial interview was conflicting. Investigator Williams testified that Hamilton never expressed a desire to stop the interview or to have a lawyer present. Captain Nydam, on the other hand, testified that Hamilton said "he did not want to talk to us right then. He said I don't want to talk right now." It was Nydam's impression that the request was temporary:
Mr. Hamilton was not really in the best frame of mind when we went in there. Number one, we woke him up. Number two, he had an encounter with the Mississippi State Police and I don't think he was very happy with them at that time, and some of those officers were present. When he woke up, he saw those officers, apparently. I don't know what kind of rapport he had with them, but I wanted to have a good rapport with the man. Number three, would be he had a nurse plucking blood out of his arm and pulling pubic hair and arm hair and he was not a happy man. So he was not really happy about talking to us right then.
And finally, Hamilton testified that he had asked for a lawyer. In light of this conflicting testimony, we are bound to follow the trial court's ruling absent an abuse of discretion. See Blanco v. State, 452 So.2d 520, 523 (Fla.1984) ("A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion."). Because reasonable persons could agree with the trial court's ruling, we find no abuse. See Huff, 569 So.2d at 1249. We find no error.
Hamilton claims as his eighth point that the State did not establish the corpus delicti for the sexual battery charge and his confession to that crime was thus inadmissible. We disagree. The Court set out the standard for corpus delicti in Meyers v. State, 22 Fla. L. Weekly S129, ___ So.2d ___ (Fla. Mar. 13, 1997):
To admit a defendant's confession, the state must prove the corpus delicti either by direct or circumstantial evidence. Bassett [v. State, 449 So.2d 803, 807 (Fla. 1984) ]; State v. Allen, 335 So.2d 823, 825 (Fla.1976). It is enough if the evidence tends to show that the crime was committed; proof beyond a reasonable doubt is not mandatory. Bassett, 449 So.2d [at] 807; Allen, 335 So.2d [at] 825. To support a conviction, however, the corpus delicti must be established beyond a reasonable doubt. Id.; Cross v. State, 96 Fla. 768, 119 So. 380, 384 (1928).
Id. at S129, ___ So.2d at ___.
The record in the present case shows that, when found, the body of the victim was too *1045 badly decomposed to reveal physiological signs of sexual assault. Nevertheless, other proof was introduced: Semen was found on the rear seat covers of the Ford Bronco, and Gayheart's body was found naked except for a pair of shorts. Further, Deputy Daniels testified that he learned the following in his discussion with co-perpetrator Wainwright:
Wainwright said that Hamilton got back into the Bronco with Gayheart and Hamilton folded the backseat down and he made Gayheart get all the way into the back of the Bronco with him and made her take off all her clothes. Wainwright said the tailgate was up and the back window was down.
And Wainwright said he walked around and got his cigarettes out of the Bronco and told Hamilton to come on. Hamilton was raping Gayheart at this time, having Gayheart lay over the backseat on her stomach and Hamilton was behind her. Wainwright said that Hamilton and Gayheart stayed in the Bronco about ten minutes. Wainwright said Gayheart was crying and asking him if they were going to let her go....
We conclude that the State introduced proof of sexual assault independent of Hamilton's confession that "tends to show that the crime was committed." Meyers, 22 Fla. L. Weekly at S129, ___ So.2d at ___. We find no error.[6]
Based on the foregoing, we conclude that competent substantial evidence supports the conviction and sentence of death and that the sentence of death is proportionate. We affirm the convictions and sentences.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in result only as to conviction and concurs as to sentence.
NOTES
[1] The trial court found the following: (1) Hamilton was under sentence of imprisonment; (2) Hamilton had been previously convicted of a violent felony; (3) the murder was committed in the course of a kidnapping, robbery, and sexual battery; (4) the murder was committed to avoid arrest; (5) the murder was especially heinous, atrocious or cruel; and (6) the murder was committed in a cold, calculated and premeditated manner.
[2] The trial court found the following: (1) Hamilton was raised in a drug-ridden, crime-infested neighborhood; (2) Hamilton's mother was mentally ill; (3) Hamilton suffered various childhood traumas, including the loss of an eye in a BB gun accident; (4) Hamilton had been gainfully employed and had good work habits; and (5) Hamilton assisted police in locating the victim's body.
[3] Hamilton claims that the trial court erred in the following matters: (1) in denying a mistrial after the State's witness said that Wainwright admitted that he and Hamilton had killed some other people after their escape; (2) in allowing the State to impeach its own witness; (3) in allowing the State to elicit testimony indicating Hamilton had lied to police; (4) in refusing to instruct the jury on the defense that Hamilton withdrew from the plan to commit murder; (5) in overruling defense objections to prosecutorial statements; (6) in admitting testimony concerning the victim's children; (7) in admitting several of Hamilton's statements obtained in violation of his right to cut off questioning; (8) in admitting Hamilton's statements that he had sexually battered the victim since the State had failed to establish the corpus delicti of that crime; and (9) in giving an unconstitutional jury instruction on the "cold, calculated, and premeditated" aggravating circumstance.
[4] For instance, in a taped statement played for the jury, Hamilton told Officer Russ Williams, "I just wanted to let the girl go." Hamilton further said on the tape that he spoke to Gayheart: "And I told her, you know we're just going to get the car and, you know, we're going to let her go."
[5] Only two statements cited by Hamilton pertain to a withdrawal defense. First, inmate Bispham stated that Wainwright told him: "Mr. Hamilton wanted to let her go, but he said my crimehe called Mr. Hamilton my crime partner, you know, he said let her go, but he said I wasn't that f'g dumb." And second, when asked whether Hamilton was in favor of killing Gayheart, Wainwright said (according to Bispham), "He was against killing her." Both Bispham's statements, however, may concern Hamilton's conduct before any plan to kill Gayheart was formulated and, as such, would not constitute evidence of his withdrawal from a subsequent plan.
[6] Issue 9 has been decided adversely to Hamilton. See Jackson v. State, 648 So.2d 85 (Fla. 1994).