# Supreme Court of Florida

_____

No. SC13-2091
_____

**JOSEPH EDWARD JORDAN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[October 8, 2015]

PER CURIAM.

This case is before the Court on direct appeal from a judgment of conviction of first-degree felony murder[1] and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the following reasons, we affirm Jordan's convictions and sentences.

## STATEMENT OF THE CASE AND FACTS

Joseph Edward Jordan lived with Keith Cope in Edgewater, Florida, and was also an employee of Cope's construction company. On or about Friday, June 26,

---

1. Jordan was also convicted of robbery with a firearm or other deadly weapon.

2009, Jordan and Cope partied together, drinking and using drugs. As they partied, Jordan asked Cope for money that Cope owed Jordan for construction work he had completed. Cope claimed that he did not have the money to pay Jordan even though Cope had money to pay for drugs. Jordan then pistol-whipped Cope; tied him up; took his money, guns, and drugs; and drove away with his Ford F-450 truck. Later that evening, Jordan appeared at the Hollywood, Florida, residence of his friend and former coworker Mathew Powell. Mathew's girlfriend, Sadia Haque, was also present when Jordan arrived. Jordan eventually shared with Mathew that Cope was literally tied up and that Mathew could go to Cope's house and clean out his gun safe, but Jordan did not want to go back to the Daytona Beach area or go near Cope's truck. Mathew decided to go, and asked his brother and ex-girlfriend, Marlon Powell and Cassandra Castellanos, to go with him.

Mathew, Sadia, Cassandra, and Marlon left Hollywood and arrived at Cope's house on Sunday, June 28, 2009, at approximately 6 a.m. Mathew and Sadia entered Cope's residence when no one answered the door. Mathew did not immediately see anyone after he entered, so he continued to search the house. When he walked into the back bedroom, he saw Cope at the foot of the bed, suspended by rope that was attached to it. Mathew removed tape from Cope's mouth and cut off the rope from Cope who then fell to the floor. Mathew then

attempted to cut the tape from Cope's legs. Sadia called 911, and first responders arrived shortly thereafter.

Detective Eric Seldaggio of the Edgewater Police Department responded with another officer to Cope's house. Mathew, Sadia, Cassandra, and Marlon met the officers and directed them inside to the back bedroom. When Detective Seldaggio entered the bedroom, which strongly smelled of urine, he observed Cope lying at the foot of the bed with his hands bound behind his back and duct tape wrapped around his head and neck. Cope's ankles were also bound with duct tape and rope. Mathew indicated that he had cut a rope that was tied on the bed and wrapped around Cope's arm. Detective Seldaggio also observed rope tied to the four bedposts, a roll of duct tape on the bed, and rope embedded in Cope's left bicep that had turned a greenish color and was cold to the touch due to suspension by that arm for a lengthy period of time. According to a responding emergency medical technician, Cope initially appeared deceased, but after multiple layers of duct tape were cut from his head to free his airway, Cope opened his eyes and moaned. Cope was later transported by ambulance to the hospital where he underwent emergency surgery to amputate his left shoulder and arm.

A day after the amputation, Cope's treating physician, Dr. Melinda Rullan, learned that Cope had been bound and gagged for three days. Based on her review of Cope's medical records, Dr. Rullan concluded that Cope's body was "literally

dying." Dr. Rullan determined that Cope entered the hospital in critical condition with a life-threatening illness related to a compartment syndrome of the left upper extremity. He had little or no blood pressure, suffered from cardiovascular collapse and multiple organ failures, and had multiple clots throughout his body. Cope also developed acute signs of a left-sided stroke and lung complications. His original physical examination evidenced that he had bindings on his right wrist and both ankles and dead tissue on his right wrist, arm, and both feet. Cope was unresponsive upon entering the hospital and remained unresponsive until his death on July 13, 2009, after being removed from life support. Medical examiner Dr. Marie Hermann opined that "Cope died as a result of complications of being bound and gagged for days, including ischemic gangrene of the left upper extremity, bilateral cerebral infarctions, and bronchopneumonia."

Following interviews with the four people who found Cope in his bedroom, Jordan was arrested on July 18, 2009, and indicted by a grand jury for one count of first-degree murder and one count of robbery with a firearm or other deadly weapon in August, 2009. On April 19, 2013, a jury found Jordan guilty of first-degree felony murder of Cope and also convicted him as charged on the robbery count. During the penalty phase, the jury recommended a sentence of death by a

vote of ten to two for the murder conviction. Following the August 2013 Spencer[2]

hearing, the trial court imposed a sentence of death for the murder conviction and a

life sentence for the conviction for robbery with a firearm or other deadly weapon.

In imposing the death sentence, the trial court concluded that the three aggravating

circumstances,[3] which were proven beyond a reasonable doubt, far outweighed the

one statutory mitigating factor and thirty-seven nonstatutory mitigators.[4] This is

Jordan's direct appeal.

---

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

3. The three aggravating circumstances were: (1) prior violent felony—little weight; (2) the capital felony was committed while the defendant was engaged in the commission of a robbery and the capital felony was committed for pecuniary gain were merged together as one aggravator in order to avoid improper doubling—great weight; and (3) the capital felony was especially heinous, atrocious, or cruel (HAC)—great weight.

4. The trial court found one statutory mitigating factor was proven: the capital felony was committed when the defendant was under the influence of extreme mental or emotional disturbance—moderate weight. The following nonstatutory mitigating factors were considered: (1) the defendant had a history of mental illness and hospitalizations—moderate weight; (2) the defendant suffered from a closed-head injury or injuries as a child—little weight; (3) the defendant was physically and emotionally abused by his mother—little weight; (4) the defendant has a sister who loves him and will maintain a loving relationship with him—little weight; (5) the defendant has the capacity to form loving relationships with friends and family members while in custody—little weight; (6) the defendant had good grades in school and obtained his general education degree—little weight; (7) the defendant has a long history of substance abuse and was hospitalized because of cocaine abuse—some weight; (8) the defendant was ill as a child and used an oxygen tank for two years—little weight; (9) the defendant is bipolar and takes a prescription medication to stabilize his moods—some weight; (10) the defendant's parents were divorced when he was twelve years of age—little

- 5 -

weight; (11) the defendant gave shelter to a homeless friend—little weight; (12) the defendant was employed as a carpenter on cruise ships and was a hard worker—little weight; (13) the defendant has two children—little weight; (14) the defendant was aware that his mother drove her car into another car in a fit of rage—little weight; (15) the defendant tried to commit suicide on three occasions—some weight; (16) the defendant has an IQ score within the average range—little weight; (17) the defendant has a memory impairment related to the effects of multiple head trauma—some weight; (18) the defendant has verbal memory weakness from mild traumatic brain damage—little weight; (19) the defendant was diagnosed as a juvenile with Attention Deficit Hyperactivity Disorder and was prescribed Ritalin—little weight; (20) the defendant had multiple prescription drugs to help with his mental health problems—some weight; (21) the defendant suffers from depression—little weight; (22) the defendant suffers from panic attacks—little weight; (23) the defendant has a severe substance abuse history—some weight; (24) the defendant received substance abuse treatment at fourteen years of age—some weight; (25) the defendant was attending Alcoholics Anonymous and Narcotics Anonymous—little weight; (26) the defendant is very nice and would perform random acts of kindness to others—minimal weight; (27) the defendant acts differently when he is on his medications as compared to when he is off his medications—some weight; (28) the defendant has loving and kind relationships with friends—little weight; (29) the defendant was not taking his bipolar medications at the time of the crime—some weight; (30) the defendant had a loving relationship with his father—little weight; (31) the defendant had cigarettes extinguished on him as a child by his mother—little weight; (32) the defendant's mother would purposely humiliate and embarrass the defendant in front of other people—some weight; (33) the defendant would not react with violence while being abused by his mother—little weight; (34) the defendant is a hard and diligent worker in many fields—minimal weight; (35) the defendant's adoptive brother loves the defendant and will maintain a loving relationship with him—little weight; (36) the mother of the defendant's child still loves the defendant and claims that he has a good heart—little weight; and (37) the defendant's family and friends do not want him to be sentenced to death—little weight. Additionally, the trial court concluded that the nonstatutory mitigator that the crime was committed in an unsophisticated manner was not established and therefore not given any weight.

On appeal, Jordan raises six issues: (1) that the trial court should have declared a mistrial due to the prosecutor's improper statements during closing arguments; (2) that the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance; (3) that the trial court abused its discretion by admitting the victim impact statements into evidence; (4) that the trial court declined to find as a mitigating circumstance Jordan's ability to conform his conduct to the requirements of the law was substantially impaired; (5) that the sentence of death should be reversed under this Court's proportionality review; and (6) that Florida's death penalty statutory scheme is facially unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002).  Additionally, we review the sufficiency of the evidence to uphold Jordan's convictions.  For the following reasons, we deny each of Jordan's claims on appeal.  We also find that there is competent, substantial evidence to sustain Jordan's convictions.

## DISCUSSION

### Prosecutorial Misconduct

Jordan argues that the trial court should have ordered a mistrial due to ten comments made by the State during its guilt-phase closing argument.  We review a trial court's ruling on a motion for mistrial under an abuse of discretion standard. See Salazar v. State, 991 So. 2d 364 (Fla. 2008).

> "A motion for mistrial should be granted only when it is necessary to
> ensure that the defendant receives a fair trial."  Cole v. State, 701 So.

2d 845, 853 (Fla. 1997). Stated differently, "[a] motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." England v. State, 940 So. 2d 389, 401-02 (Fla. 2006); see Hamilton v. State, 703 So. 2d 1038, 1041 (Fla. 1997) ("A mistrial is appropriate only where the error is so prejudicial as to vitiate the entire trial."). Under the abuse of discretion standard, a trial court's ruling will be upheld unless the "judicial action is arbitrary, fanciful, or unreasonable . . . . [D]iscretion is abused only where no reasonable [person] would take the view adopted by the trial court." Trease v. State, 768 So. 2d 1050, 1053 n.2 (Fla. 2000) (second alteration in original) (quoting Huff v. State, 569 So. 2d 1247, 1249 (Fla. 1990)). Thus, "[i]n order for the prosecutor's comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise."

Id. at 372.

In this case, Jordan asserts one preserved prosecutorial misconduct claim. He argues that the prosecutor impermissibly attempted to sway the jury by giving the impression that the State's interpretation of felony murder was supported by caselaw. We have held that "[i]t is appropriate for an attorney who does not misstate the law to relate it to the facts of the case in closing argument." Kaczmar v. State, 104 So. 3d 990, 1006 (Fla. 2012). However, "[t]he correct practice does not permit counsel to read authorities to the jury, and while counsel may submit his [or her] theory of the law in written requested charges, it is the function of the trial court to charge the law applicable to the issues in the case." Id. (quoting Tindall v.

- 8 -

State, 128 So. 494, 498 (Fla. 1930)) (internal quotation marks omitted) (second

alteration in original).

During closing arguments of the guilt phase, the prosecutor made the

following statement:

> So let's take a look at the first-degree felony murder instruction.
> To prove the crime of first-degree felony murder, the State must prove
> the following three elements:
> Keith Cope is dead. Agreed by both sides and testified to by
> every witness.
> The death occurred as a consequence of and while Joseph
> Jordan was engaged in the commission or attempting to commit a
> robbery.
> The way the caselaw interprets that, the way the law - -

Defense counsel objected, and the parties approached the bench outside the hearing

of the jury. Defense counsel then moved for a mistrial, arguing that it was

improper for the State to support its theory of the case in closing argument with

caselaw. The trial court ruled that the prosecutor had not reached the point that

any damage was done and cautioned the State to stay away from arguing caselaw.

The prosecutor then continued:

> Back to point number two, ladies and gentlemen, the death occurred
> as a consequence of and while Joseph Jordan was engaged in the
> commission of attempting - - or attempting to commit a robbery. The
> way that this phrase is interpreted, you see, Joseph Jordan committed
> a robbery. There's no doubt. But under this phrase, it may look like
> Keith Cope has to die there in the house. That's not what the law
> requires. The law requires the injury to have occurred during and as a
> consequence of the robbery. Joseph - - or Keith Cope can die later.
> He can die outside the home. He can die in the hospital sometime
> later. The law doesn't require him to drop dead immediately on the

scene. That - - that would reach a preposterous result in the law, and it isn't the purpose of the felony-murder instruction.

This portion of the transcript shows that defense counsel's immediate objection to the prosecutor's mention of the word "caselaw" precluded the prosecutor from stating any case names or citations of cases or to explain the facts or holdings of any cases. During his remaining argument, the prosecutor did not mention the term "caselaw." Rather, he explained to the jury how the law was applicable to the evidence presented at trial, i.e., that Cope's immediate death at the crime scene was not a required element of felony murder. Such an explanation is a permissible argument. See Kaczmar, 104 So. 3d at 1006. Therefore, the isolated comment did not deprive Jordan of a fair trial. See Card v. State, 803 So. 2d 613, 622 (Fla. 2001) (denying mistrial where an isolated reference to a phrase by the prosecutor during closing arguments was not so prejudicial as to vitiate the entire trial). Moreover, although defense counsel declined a curative instruction, the trial court later properly instructed the jury regarding first-degree felony murder. Thus, we find that the trial court properly denied defense counsel's motion for mistrial.

Jordan also contends that the prosecutor's statement, "Don't let him get away with this," constitutes an improper comment. Because Jordan failed to contemporaneously object to this comment, we apply a fundamental error review. See Braddy v. State, 111 So. 3d 810, 837 (Fla. 2012) (citing Brooks v. State, 762

- 10 -

So. 2d 879, 899 (Fla. 2000) (defining fundamental error as that which "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.")).  "If this Court finds a comment to be improper, factors to be weighed in determining whether an improper comment rises to the level of fundamental error include whether the statement was repeated and whether the jury was provided with an accurate statement of the law after the improper comment was made."  See Poole v. State, 151 So. 3d 402, 415 (Fla. 2014), cert. denied, 135 S. Ct 2052 (2015).

Specifically, Jordan challenges the following statement in the prosecutor's rebuttal closing argument:

> You can find him guilty of first-degree murder or guilty of such lesser-included charges.  That's second degree, third degree, manslaughter with a weapon or manslaughter.  Ladies and gentlemen, you can go all the way down the list, but the law tells you find him guilty of the highest one that's been proven.  Sure.  Look at the instructions.  They may all apply in this situation because of the way this thing developed, they may all apply.  I mean, you may be able to technically find him guilty of all of them, but you should find him guilty of the highest one that has been charged and proven beyond a reasonable doubt.  And in this case it's first-degree murder, felony murder, first degree.  And when you get over here to - - to the robbery, count two right up here, count two, robbery with a fire weapon - - firearm or deadly weapon, right here on the first line, guilty of the charge of robbery with a firearm or deadly weapon, exactly what he confessed to, exactly what he told you he had done.  Don't let him get away with this.  Yeah.  I mean sure.  You can come down the list again if you want to.  I mean, he's technically guilty of all of them.  Robbery with a weapon, yep.  Robbery, yep.  Grand theft, did he steal something without any force?  Well, he stole something, but he - - he used force.  I mean, yeah.  You can come down the list, but there's no reason to.  The law says to return it to the highest crime

- 11 -

proven beyond a reasonable doubt. And, ladies and gentlemen, it is right there. It is choice number one.

(Emphasis added). Within the context of the argument, the prosecutor told the jury that there were lesser-included offenses, and he listed them. He then beseeched the jury not to let the defendant get away with first-degree felony murder if that was the crime for which they chose to convict him.

While we find the comment was indeed improper, we do not find that the prosecutor's comment rises to the level of fundamental error. The prosecutor mentioned the comment only one time, and after saying, "Don't let him get away with this," the prosecutor still invited the jury to consider the lesser-included offenses. Also, the trial court read the standard jury instructions, which included an accurate statement of the law with regard to first-degree felony murder and the lesser-included offenses. See Poole, 151 So. 3d at 418.

Finally Jordan raises eight additional claims of prosecutorial misconduct during closing arguments in the guilt phase. We find those claims meritless and unpreserved for appellate review. See Riechmann v. State, 581 So. 2d 133, 139 (Fla. 1991). We also find that none of the comments, taken individually or cumulatively, constitute fundamental error. See Braddy, 111 So. 3d at 837 (citing Card v. State, 803 So. 2d 613, 622 (Fla. 2001)); see also Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007). Accordingly, we deny relief for these claims.

**Heinous, Atrocious, or Cruel Aggravating Circumstance**

Jordan alleges that the heinous, atrocious, or cruel (HAC) aggravating circumstance may not be applied to him because he did not know Cope would die

- 12 -

or how he would die when Cope attempted to extricate himself from his bindings.

We find this claim to be without merit.

In Williams v. State, 37 So. 3d 187, 195 (Fla. 2010), we explained the

proper standard of review for aggravating circumstances:

> "The standard of review this Court applies to a claim regarding the
> sufficiency of the evidence to support an aggravating circumstance is
> that of competent, substantial evidence." Guardado v. State, 965 So.
> 2d 108, 115 (Fla. 2007). "When reviewing a trial court's finding of an
> aggravator, 'it is not this Court's function to reweigh the evidence to
> determine whether the State proved each aggravating circumstance
> beyond a reasonable doubt—that is the trial court's job.' " Aguirre–
> Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009) (quoting Willacy v.
> State, 696 So. 2d 693, 695 (Fla. 1997)). Rather, it is this Court's task
> on appeal "to review the record to determine whether the trial court
> applied the right rule of law for each aggravating circumstance and, if
> so, whether competent substantial evidence supports its finding." Id.
> (quoting Willacy, 696 So. 2d at 695).

" '[I]n determining whether the HAC factor was present, the focus should be

upon the victim's perceptions of the circumstances as opposed to those of the

perpetrator.' " Pham v. State, 70 So. 3d 485, 497 (Fla. 2011) (quoting Lynch v.

State, 841 So. 2d 362, 369 (Fla. 2003)). We further explained in Russ v. State, 73

So. 3d 178, 196-97 (Fla. 2011), that

> HAC concentrates "on the means and manner in which the death is
> inflicted and the immediate circumstances surrounding the death,
> rather than the intent and motivation of a defendant, where a victim
> experiences the torturous anxiety and fear of impending death."
> Barnhill v. State, 834 So. 2d 836, 850 (Fla. 2002) (citing Brown v.
> State, 721 So. 2d 274, 277 (Fla. 1998)); Evans v. State, 800 So. 2d
> 182, 194 (Fla. 2001). Thus, there does not need to be a showing that
> the defendant intended or desired to inflict torture; the torturous

- 13 -

manner of the victim's death is evidence of a defendant's indifference. See Barnhill, 834 So. 2d at 850 (citing Brown, 721 So. 2d at 277). The victim's mental state may be evaluated in accordance with common-sense inferences from the circumstances. See Hernandez v. State, 4 So. 3d 642, 669 (Fla. 2009) (citing Swafford v. State, 533 So. 2d 270, 277 (Fla. 1988)). To support HAC, the evidence must show that the victim was conscious and aware of impending death. Hernandez, 4 So. 3d at 669 (citing Douglas v. State, 878 So. 2d 1246, 1261 (Fla. 2004)). However, this Court has explained that the actual length of the victim's consciousness is not the only factor relevant to HAC—"Fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel." Hernandez, 4 So. 3d at 669 (quoting James v. State, 695 So. 2d 1229, 1235 (Fla. 1997)).

Finally, we have repeatedly upheld the HAC aggravating circumstance in many cases involving the beating death of the victim. See Patrick v. State, 104 So. 3d 1046 (Fla. 2012), cert. denied, 134 S. Ct. 85 (2013); Lawrence v. State, 698 So. 2d 1219, 1222 (Fla. 1997).

The record demonstrates that the trial court applied the correct rule of law. Further, in finding the HAC aggravating circumstance, the trial court detailed the slow, tortuous death of Cope at the hands of Jordan:

> The evidence showed that the victim was found, hanging from his own bed by ropes and duct tape, drifting in and out of consciousness. The Medical Examiner and treating physicians testified to the jury as to the especially painful process leading to the victim's death. Those witnesses testified as to the terrible pain and the psychological anguish the victim would have suffered leading up to his slow death.
> The evidence did show clearly that the victim was robbed on June 25, 2009, by the defendant and the victim was beaten, held at gun point, and pistol-whipped by the defendant. The victim had duct tape wrapped numerous times around his head, covering his mouth

- 14 -

and part of his nose. His wrists and ankles were also bound by tape and rope. Further, he was tied to the four corners of his bed and left there to struggle.

Prior to his discovery, the victim was left alone tied to his bed for three days. During [those] three days, his body slowly shut down, and his arms and legs turned cold and circulation was slowly lost. The evidence showed that he had abrasions on his wrists and ankles as he struggled to get free from the ropes.

He was found three days later still partially on the bed soaked in his own urine.

The medical testimony showed the victim suffered from dehydration, acidosis, and rhabdomyolysis, renal failure, aspiration pneumonia, lower right lobe bronchopneumonia, splenic infarctions, abrasions, from being bound and gagged, lacerations to his mouth, and bilateral cerebral infarctions. The medical testimony clearly showed that these injuries were the direct result from being bound and gagged for the three days before the victim's discovery.

In addition to the above described injuries, the victim had an acute injury to his left arm which was created during his failed attempt to free himself. Gangrene had started in one of his arms, because of the tight ropes, which led to his arm and part of his shoulder being amputated at the hospital prior to his death.

Though it was unknown how long the victim was left hanging partially off the bed and suspended by the ropes, the medical evidence suggested that it probably was at least 6 hours. Testimony before the jury by one of the doctors indicated that in the doctor's opinion, on a scale of 1 to 10 for pain, the pain suffered by the victim would have been a 10.

These findings are supported by competent, substantial evidence, especially considering that there does not need to be a showing that Jordan intended or desired to inflict torture in the instant case. See Barnhill v. State, 834 So. 2d 836, 850-51 (Fla. 2002); see also Patrick, 104 So. 3d at 1053-54, 1067 (affirming the finding of HAC where the victim was beaten, had his head and face taped, had his

- 15 -

ankles and hands bound behind his back, and was left in a bathtub on his stomach).

Accordingly, we deny relief as to this claim.

**Victim Impact Statements**

Jordan argues that the trial court erred in admitting victim impact statements because they were so prejudicial that they amounted to a nonstatutory aggravator and violated his due process rights and section 921.141(7), Florida Statutes. We disagree.

"A trial court's decision to admit victim impact testimony is reviewed for an abuse of discretion." Kalisz v. State, 124 So. 3d 185, 211 (Fla. 2013), cert. denied, 134 S. Ct. 1547 (2014). We have stated the following with regard to the use of victim impact statements and their admissibility:

> In Payne v. Tennessee, 501 U.S. 808 (1991), the United States Supreme Court held that the State may seek to introduce victim impact evidence if it concludes that such evidence "about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Id. at 827. The admission of victim impact evidence is protected by article I, section 16, of the Florida Constitution, and is also specifically governed by section 921.141(7), Florida Statutes.

Kalisz, 124 So. 3d at 210-11. Because Jordan's crimes were committed on or about June 25, 2009, section 921.141(7), Florida Statutes (2008), applies, which states as follows:

> (7) VICTIM IMPACT EVIDENCE.—Once the prosecution has provided evidence of the existence of one or more aggravating

- 16 -

circumstances as described in subsection (5),[5] the prosecution may introduce, and subsequently argue, victim impact evidence to the jury. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.

Emilee Cope's Victim Impact Statement

According to the record, defense counsel objected to several portions of the victim impact statement of the victim's daughter, Emilee Cope. The relevant portions were read to the jury as follows:

> It was difficult to watch my father struggle for his last breath, and I begged him to let go when he was taken off of life support.
> . . . .
> It is not fair that I never got to have my dad there when I got my first car or to take pictures with me on my prom night or wave to me during my graduation.
> I will never get to have my dad walk me down the aisle when I get married or teach my possible future children the wonderful things he knew. It breaks my heart that I will never hear his voice again, see him smile, or feel one of his big bear hugs again in my life.
> It was not just my father that was taken from me, but also a large piece from what was supposed to be some of the happiest years of my life.
> . . . .
> My father's death has forever changed my life. I will always be vigilant about the safety of my loved ones and question whom they place their trust with.
> I have never been able to relax when away from home out of fear that I will receive a phone call that someone I love has been hurt.

---

5. The HAC aggravator is one of the enumerated aggravating circumstances in section 921.141(5), Florida Statutes (2008).

I know my life will never be the same. Every time I hear a motorcycle, Corvette or diesel truck, I look to see if maybe, just maybe, it was all just a nightmare and he's coming home.

. . . .

There are no words to describe how terrifying and heart-wrenching it was for me, as a 15-year-old girl, to see my father, who was so strong, tall and proud, to be in a hospital bed without the ability to even breathe on his own.

We find that Emilee's statements about her father not being available to experience her first car, prom night, graduation, or wedding and her feeling vigilant about the safety of her loved ones are permissible testimony in a victim impact statement. We find that such testimony does not run afoul of section 921.141(7) or the guidelines in Payne. See Kalisz, 124 So. 3d at 211 (finding that statements which were not overly emotional, did not mention the defendant's name, did not implore the jury to impose the death penalty, or did not seek revenge on the defendant for the victim's death were permissible victim impact statements); Jackson v. State, 127 So. 3d 447, 473-74 (Fla. 2013) (concluding that a statement constituted permissible victim impact evidence because it was directly related to the effect of the victim's death on the victim's brother); Baker v. State, 71 So. 3d 802, 817-18 (Fla. 2011) (finding no error where victim impact statement included testimony about a family member's fears regarding her own security and sense of personal responsibility).

Jordan also argues that Emilee's descriptions of her feelings as she watched her father take his last breath and his inability to breathe on his own were improper

- 18 -

direct comments on the HAC aggravating circumstance in violation of section 921.141(7) and the United States Constitution. Because "[f]amily members' emotions resulting from the loss of the victim, including feelings of pain, anger, or fear, are directly related to the family's affection for the victim and the impact caused by his or her death," Emilee's two remaining statements also are permissible victim impact evidence. See Baker, 71 So. 3d at 818. Accordingly, we deny relief.

Madgalene "Maggie" Cope's Victim Impact Statement

Regarding Maggie Cope's victim impact statement, the record reflects that defense counsel objected to the use of the words "horrific" and "horrible" in describing Keith Cope's death. He also objected to the victim impact evidence being used to support the HAC aggravating circumstance. The trial court agreed only to the redaction of the words "horrific" and "horrible."

Jordan asserts that portions of Maggie's victim impact statement impermissibly characterize the crimes in violation of section 921.141(7). We disagree. In her statement, Maggie described her last days with her ex-husband, how she felt serving as his health care surrogate, her experience in watching her daughter grieve over her father, and her personal experience in grieving her ex-husband's death, including the mention of items that jogged her memory of how he died. We hold that such remarks do not violate section 921.141(7) or the

- 19 -

guidelines set forth in <u>Payne</u> regarding victim impact statements.  <u>See</u> <u>Jackson</u>, 127

So. 3d at 473-74; <u>Abdool v. State</u>, 53 So. 3d 208, 222 (Fla. 2010).  Therefore,

Maggie's statement is permissible victim impact evidence, and we deny relief.

Lucinda Jenkins' Victim Impact Statement

Jordan contends that the admission of Lucinda's victim impact statement, to

which defense counsel failed to object and which was read to the jury by the victim

advocate, was fundamental error and therefore violated his due process rights.  We

disagree.  We recognize that

> evidence that places undue focus on victim impact, even if not
> objected to, can in some cases constitute a due process violation.  The
> United States Supreme Court in <u>Payne v. Tennessee</u>, 501 U.S. 808,
> 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), held that where state law
> permits, the Eighth Amendment erects no per se bar to the state
> presenting evidence about the victim, the impact of the murder on the
> victim's family, and argument on these subjects.  <u>Id.</u> at 827, 111 S. Ct.
> 2597.  However, the Supreme Court also stated: "In the majority of
> cases, and in this case, victim impact evidence serves entirely
> legitimate purposes.  <u>In the event that evidence is introduced that is so
> unduly prejudicial that it renders the trial fundamentally unfair, the
> Due Process Clause of the Fourteenth Amendment provides a
> mechanism for relief.</u>  <u>Id.</u> at 825, 111 S. Ct. 2597 (emphasis added).
> The analysis to determine if admission of victim impact evidence has
> violated a defendant's due process rights in the penalty phase of a
> capital trial parallels the analysis for fundamental error.  <u>See, e.g.</u>,
> <u>F.B.</u> [v. State], 852 So. 2d [226,] 229 (Fla. 2003) ("[A]n error is
> deemed fundamental 'when it goes to the foundation of the case or the
> merits of the cause of action and is equivalent to a denial of due
> process.' ").  Fundamental error is also defined as error that "reach[es]
> down into the validity of the trial itself to the extent that [the advisory
> verdict] could not have been obtained without the assistance of the
> error."

- 20 -

Wheeler v. State, 4 So. 3d 599, 606 (Fla. 2009).

In the present case, we find no fundamental error. Lucinda's statement demonstrates evidence of her grief and suffering due to the loss of her nephew. See Victorino v. State, 127 So. 3d 478, 496 (Fla. 2013), cert. denied, 134 S. Ct. 1893 (2014). In addition, Lucinda did not opine about or characterize the murder or robbery, the defendant, or the appropriate sentence that Jordan should receive. As such, Lucinda's statement does not reach the foundation of the case or the merits of the cause of action. Thus, her victim impact statement is not fundamental error, and we therefore deny relief.

## Rejection of a Statutory Mitigator

Jordan contends that the trial court erred in rejecting the statutory mitigator that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. See § 921.141(6)(f), Fla. Stat. (2008). Specifically, Jordan asserts that section 921.141(6)(f), Florida Statutes, does not require an expert witness to employ the exact wording of the statute in his or her testimony for this mitigator to apply. He also asserts that there was other witness testimony that would have supported the mitigator. Jordan highlights evidence of him suddenly "snapping" immediately before committing the crimes against Cope, and his demeanor shortly after committing the crimes, including being antsy and nervous and experiencing

withdrawals from drug use. "[W]hether a [mitigating] circumstance has been proven is subject to the competent, substantial evidence standard of review." Martin v. State, 107 So. 3d 281, 318 (Fla. 2012) (citing Ault v. State, 53 So. 3d 175, 189 (Fla. 2010)). In Oyola v. State, 99 So. 3d 431, 444-45 (Fla. 2012), we set forth the following requirements regarding mitigating circumstances:

> A trial court must expressly evaluate all statutory and nonstatutory mitigators a defendant has proposed. See Ault v. State, 53 So. 3d 175, 186 (Fla. 2010), cert. denied, 132 S. Ct. 224 (2011). A trial court must find a proposed mitigating circumstance when the defendant has established that mitigator through competent, substantial evidence. See Reynolds v. State, 934 So. 2d 1128, 1159 (Fla. 2006). However, a trial court may reject a mitigator if the defendant fails to prove the mitigating circumstance, or if the record contains competent, substantial evidence supporting that rejection. See Ault, 53 So. 3d at 186. "Even expert opinion evidence may be rejected if that evidence cannot be reconciled with other evidence in the case." Id. (quoting Coday v. State, 946 So. 2d 988, 1003 (Fla. 2006)). A mitigator may also be rejected if the testimony supporting it is not substantiated by the actions of the defendant, or if the testimony supporting it conflicts with other evidence. See Douglas v. State, 878 So. 2d 1246, 1257 (Fla. 2004) (holding that although testimony supported a mitigator, the trial court did not err by not finding it because the actions of the defendant did not substantiate that testimony); see also Coday, 946 So. 2d at 1005 ("The expert testimony from the defense could be rejected only if it did not square with other evidence in the case.").

The trial court's rejection of this mitigator is supported by competent, substantial evidence. According to the testimony of Dr. Eric Mings, the State's expert psychologist who tested Jordan for six hours using various psychological exams, Jordan had a history of bipolar disorder, severe polysubstance abuse, and mild memory impairment. Dr. Mings' testing determined that Jordan had an

- 22 -

average to lower-than-average IQ and lower-than-expected memory abilities. Dr. Mings observed nothing to suggest that Jordan was psychotic or delusional, and during the six-hour evaluation, Jordan communicated effectively. On cross-examination, defense counsel asked Dr. Mings if he agreed that Jordan had the capacity and the ability to follow the law if he chose to do so, to which Dr. Mings responded, "Probably so."

Dr. Jeffrey Danziger, the defense's expert psychiatrist who also evaluated Jordan, testified that Jordan experienced multiple head injuries as a youth which required him to be hospitalized, was diagnosed with attention deficit hyperactivity disorder as a juvenile and bipolar disorder as an adult, and attempted suicide twice in his lifetime. Jordan also admitted to the use of several illegal drugs, including, but not limited to, powder cocaine, crack cocaine, and ecstasy. Dr. Danziger described Jordan as being cooperative and pleasant during the evaluation. Dr. Danziger further testified that Jordan did not appear to be intellectually impaired; he did not show any extreme or atypical psychotic symptoms; and he demonstrated average intelligence. On cross-examination, the State asked Dr. Danziger if Jordan had the ability to conform his conduct to the laws of society, and Dr. Danziger answered that he did not see anything to indicate that Jordan lacked self-control, or could not control himself or behave appropriately.

Defense counsel did not offer additional expert witnesses to refute Dr. Mings' testimony. Also, the lay witnesses testified only about Jordan's demeanor a few days after the crime was committed. Therefore, based on the record, the expert witnesses' testimonies are consistent at least to the extent that neither expert's evaluation of Jordan demonstrated that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired at the time he beat, robbed, and tied up Cope. See Cook v. State, 542 So. 2d 964, 971 (Fla. 1989) (affirming the trial court's rejection of a mitigating factor because the record contained positive evidence that the defendant's mental capacity was not severely diminished on the night of the killings). Accordingly, we find that the trial court did not abuse its discretion and deny relief with respect to this claim.

## Proportionality

We conduct a comprehensive review of each death sentence to determine if the murder falls within the category of both the most aggravated and the least mitigated murders in order to ensure uniformity in the application of the death sentence. See Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003). We review the totality of the circumstances and compare the case to other capital cases. Williams v. State, 37 So. 3d 187, 205 (Fla. 2010) (citing Offord v. State, 959 So. 2d 187, 191 (Fla. 2007)). This analysis does not involve a quantitative comparison

between the number of aggravating and mitigating factors, but rather requires a qualitative review of the underlying basis for each aggravating factor and mitigating factor. Id. Additionally, the prior violent felony and HAC aggravators are qualitatively among the weightiest aggravating circumstances. See Kocaker v. State, 119 So. 3d 1214, 1232 (Fla.), cert. denied, 133 S. Ct. 2743 (2013); Hodges v. State, 55 So. 3d 515, 542 (Fla. 2010).

In the instant case, the trial court found that three aggravating circumstances were proven beyond a reasonable doubt: (1) prior violent felony conviction—little weight; (2) the capital felony was committed while the defendant was engaged in the commission of a robbery, and the capital felony was committed for pecuniary gain were merged together as one aggravator in order to avoid improper doubling—great weight; and (3) HAC—great weight. The trial court concluded that only one statutory mitigating factor applied—the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance—which was accorded moderate weight. The trial court also found thirty-seven nonstatutory mitigators and gave one moderate weight, ten some weight, two minimal weight, and the rest little weight. Additionally, the trial court concluded that the nonstatutory mitigator that the crime was committed in a unsophisticated manner was not established and therefore not given any weight.

After reviewing the totality of the circumstances and decisions from this Court, we conclude that Jordan's death sentence is proportionate in relation to other death sentences that we have upheld. See Brant v. State, 21 So. 3d 1276, 1285-88 (Fla. 2009) (concluding that the defendant's "impairment due to abnormal brain functioning and drug use, while mitigating, is not so mitigating as to make his death sentence disproportionate," where two aggravating circumstances—HAC and the murder was committed during a sexual battery—were weighed against three statutory mitigating circumstances and ten nonstatutory mitigating circumstances); Merck, 975 So. 2d at 1066 (finding the death sentence to be proportionate in light of the trial court's finding of two aggravating factors—prior violent felony and HAC; one statutory mitigating factor—defendant's age of nineteen at the time of the murder; and several nonstatutory mitigating factors); Johnston v. State, 863 So. 2d 271, 286 (Fla. 2003) (concluding the death sentence was proportionate where the trial court found the prior violent felony and HAC aggravators, the statutory mitigator regarding impaired capacity, and twenty-six nonstatutory mitigating factors). Accordingly, we find that the death sentence is proportionate in this case.

## Ring Claim

Jordan challenges the constitutionality of Florida's capital sentencing scheme on the basis that Florida is the only state in the country that allows a

majority verdict by a jury that is already predisposed to recommend a sentence of death. We have "repeatedly held that Florida's capital sentencing scheme does not violate the United States Constitution under Ring [v. Arizona, 536 U.S. 584 (2002)]." See, e.g., Martin v. State, 107 So. 3d 281, 322 (Fla. 2012) (citing Abdool v. State, 53 So. 3d 208, 228 (Fla. 2010)). Furthermore, we have also repeatedly held that Ring is not implicated when, as in the present case, the prior violent felony . . . aggravating factor is applicable. Id. In other words, "the requirement that the jury make all of the findings necessary to enhance a defendant's sentence is satisfied where one of the aggravators is the prior violent felony aggravator." Merck, 975 So. 2d at 1067. Accordingly, we reject Jordan's Ring claim.

### Sufficiency of the Evidence

Although Jordan does not raise the issue of sufficiency of the evidence on appeal, we nevertheless must independently review "the evidence to determine whether sufficient evidence exists to support a first-degree [felony] murder conviction." Dessaure v. State, 891 So. 2d 455, 472 (Fla. 2004). "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Caraballo v. State, 39 So. 3d 1234, 1243-44 (Fla. 2010) (quoting Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006)).

- 27 -

Here, Jordan was convicted of first-degree felony murder and robbery with a firearm or other deadly weapon. First, there is competent, substantial evidence to support Jordan's conviction of robbery with a firearm or other deadly weapon. A robbery is defined as

> the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear.

§ 812.13(1), Fla. Stat. (2008). "If in the course of committing the robbery the offender carried a firearm or other deadly weapon, then the robbery is a felony of the first degree. . . ." § 812.13(2)(a), Fla. Stat. (2008).

According to the evidence adduced at trial, Edwin Yarrow testified that Jordan pistol-whipped Cope, tied him up, and stole Cope's money, guns, and drugs. Sadia Haque testified that Jordan had Cope's Ford F-450 truck and drove it from Cope's home in the Edgewater, Florida, area to the Hollywood, Florida, area. Mathew Powell also testified regarding Jordan's use of Cope's truck, which Cope never loaned to anyone, and that Jordan continually stated that Cope was tied up. In a letter to Cope's ex-wife Maggie, Jordan admitted to robbing Cope with the use of Cope's gun. Bank records associated with Cope's credit card showed various withdrawals and purchases made on the day of and on the days following the crime.

- 28 -

There is also competent, substantial evidence to support the conviction of first-degree felony murder. Felony murder is defined in section 782.04(1)(a)2.d., Florida Statutes (2008), which states:

> [T]he unlawful killing of a human being . . . when committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any . . . robbery . . . is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082.

Mathew and Marlon Powell testified regarding the manner in which they found Cope at the crime scene. Cope was suspended from the foot of his bed by rope and duct tape. His face, neck, and head were duct taped, and his left bicep was a greenish color and cold to the touch due to Cope being suspended by that arm for a lengthy period of time. A first responder testified that Cope looked deceased when he arrived on the crime scene. Dr. Rullan also testified about Cope's various injuries and stated that he was unresponsive upon entering the hospital and remained unresponsive until he died after being removed from life support. Dr. Hermann opined "that Mr. Cope died as a result of complications of being bound and gagged for days, including ischemic gangrene of the left upper extremity, bilateral cerebral infarctions, and bronchopneumonia."

Because the underlying felony of robbery with a firearm or other deadly weapon is supported by the record, we conclude that first-degree felony murder is likewise supported by the record.

# CONCLUSION

Based on the foregoing analysis, we affirm Jordan's convictions and sentences.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Volusia County,
    R. Michael Hutcheson, Judge - Case No. 642009CF002872XXXAWS

Jeffrey Duane Deen, Regional Counsel, and Michael Paul Reiter, Assistant Regional Counsel, Fifth District, Ocala, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Stacey E. Kircher, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee